## MILNE *against* MORETON.

### IN ERROR.

1814.

*Philadelphia,*
*Monday,*
July 25.

THIS was a writ of error to the District Court of the city and county of *Philadelphia*, where a judgment had been rendered in favour of *Moreton* the plaintiff below, upon the following case.

An assignment by commissioners of bankrupt in *England*, does not prevent an attachment of the bankrupt's effects by an *American* creditor.

" *Walter Moreton* the plaintiff is a merchant residing in " the city of *New York*, and a citizen of the *United States*, " and *Thomas Topham*, the defendant in the foreign attach- " ment, is a subject of the King of *Great Britain* residing " in *England*.

" The defendant *Thomas Topham*, through the plaintiff's " agent in *Liverpool*, transmitted to the plaintiff a consider- " able quantity of goods to be sold on commission, and re- " ceived from the agent an advance on account of them. " The goods were sold in this country, an account sales " was rendered on the 20th *July* 1807, and the nett pro- " ceeds of sales were less than the sum advanced in *Liver-* " *pool*. This attachment issued for the balance on the 5th " *December* 1807.

" On the 22d *September* 1807, a commission of bankrupt, " from the lord chancellor of *England*, issued against the de- " fendant in the attachment, on the 9th *October* in the same " year a provisional assignment was executed of all his es- " tate real and personal, and on the 29th of the same month " the final assignment was executed.

" Goods of *Thomas Topham* are admitted in the hands " of *Richard Milne* the garnishee, which were the property " of the defendant before any act of bankruptcy committed " by him, and it is also admitted that their amount equals " the sum found in the inquisition.

" The question submitted to the Court is, whether the " goods in the hands of the garnishee are liable to this " attachment, notwithstanding the bankruptcy of the de- " fendant?

" If the Court shall be of opinion that they are so liable, " judgment to be entered for the plaintiff. But if the Court " shall be of opinion that they are not so liable, then judg-

1814.

MILNE
v.
MORETON.

" ment to be entered for the defendant; it being agreed, that
" for the purposes of a writ of error, either party shall be at
" liberty to consider the judgment of the Court which shall
" be rendered hereupon, as though it were rendered upon
" the finding of a special verdict."

The case was twice argued in this Court, first at the adjourned term in *June* 1813, by *Montgomery* and *Binney* for the plaintiff in error, and by *N. Chauncey* and *Chauncey* for the defendant; and again in *March* last, by the same counsel with the addition of *Ingersoll* for the plaintiff in error, and *Rawle* for the defendant.

Arguments for the plaintiff in error. The attachment must be defeated for two reasons, 1. Because *Topham's* debt having been contracted in *England*, with reference to the laws of *England*, it was discharged by his certificate (*a*). 2. Because by the assignment of the commissioners, *Topham's* effects in the hands of *Milne*, were equitably transferred to the assignees.

1. The debt was contracted in *England*, because the money was there advanced to the bankrupt, the goods were furnished there, and there the implied assumpsit originated, that in case the money advanced should exceed the nett proceeds of the goods, *Topham* would pay the difference. The law of *England* was therefore in the view of the parties. The promise was to be performed there. *Robinson* v. *Bland* (*b*), *Champant* v. *Ranelagh* (*c*). This being the case, by a variety of decisions a discharge under the law of that country, discharges the debt. *Burrows* v. *Jemino* (*d*), *Green* v. *Sarmiento* (*e*), *Smith* v. *Smith* (*f*), *Quin* v. *Keefe* (*g*), *Smith* v. *Buchanan* (*h*), *Pedder* v. *M'Master* (*i*). At all events *Topham* could not have been held to bail by *Moreton*, and therefore his property could not be attached.

2. The assignment of the commissioners passed *Topham's* interest in the debt due to him by *Milne*.

Any appropriation or transfer of a fund, though it be merely equitable, will prevent a subsequent attachment. In

(*a*) Although the case does not state a certificate, it was argued on both sides upon the ground, that a certificate had been granted.

| | | |
|---|---|---|
| (*b*) 2 *Burr.* 1079. | (*e*) 1 *Browne. App.* 30. | (*h*) 1 *East* 6. |
| (*c*) *Prec. Chan.* 128. | (*f*) 2 *Johns.* 241. | (*i*) 8 *D. & E.* 609. |
| (*d*) 2 *Stra.* 733. | (*g*) 2 *H. Black.* 553. | |

*Fitzgerald* v. *Caldwell*, formerly decided in this Court, a letter by a creditor to his debtor, appropriating the debt to a third person, was held to be a sufficient transfer. In *Sharpless.* v. *Welsh* (a) the same. Strictly there can be no legal assignment of a chose in action. All acts which devest the creditor's interest are therefore upon a footing; and any thing which deprives him of his beneficial title to the debt, prevents his creditor from appropriating it to himself by attachment.

An assignment by commissioners of bankrupt is equivalent to a voluntary assignment. Debts due to the bankrupt have in contemplation of law no locality; they attend his person, are subject to the same law, are transferred by assignments in conformity with that law, follow its distribution in the case of an intestacy, *Pipon* v. *Pipon* (b), and in the case of testamentary disposition will not pass if there is a want of such conformity. This Court in the case of *Desesbats* v. *Berquier* (c), has solemnly established this doctrine. It is a binding authority, and must carry the Court to all its legitimate consequences. The debt due to *Topham*, must then be considered as within the same *English* jurisdiction with himself, present at the same domicil, and governed by the same law. Why then shall not a statutory transfer pass it? It is not allowing extra-territorial effect to the statute, for the chattel on which it operates is within the territory of the law maker. It does not contravene the will of the bankrupt, because as a subject of the country, he has assented to the law, and all proceedings under it; and he brings himself voluntarily within its provisions, as a trader. It is not without consideration, but upon the best, the payment of debts. It has accordingly been respected by all nations, as a sufficient transfer to prevent a subsequent attachment. By *England* as early the year 1760, in the case of a *cessio bonorum* in *Holland*. *Solomons* v. *Ross* (d), and *Jollet* v. *Deponthieu* (e). By *Ireland* in the case of an *English* assignment. *Neal* v. *Cottingham* (f). By *France*, in the case of a similar assignment. *Parish* v. *De Gravier* (g), and *Terrasson's* case (h). And the principle, as well as this particular

---

(a) 4 *Dall.* 278.      (d) 1 *H. Black.* 131.      (g) *Cooper's Bank. Law,*
(b) *Ambl.* 25.         (e) *Id.* 132.               *App.* 27.
(c) 1 *Binn.* 345.      (f) *Id.* 132.              (h) *Ib.*

1814.

MILNE
v.
MORETON.

application of it, has been sanctioned in a great variety of cases; *Hunter* v. *Potts* (a), *Sill* v. *Worswick* (b), *Smith* v. *Buchanan* (c), *Waring* v. *Knight* (d); in *Massachusetts*, *Goodwin* v. *Jones* (e), in *New York*, *Burd* v. *Pierpont* (f), *Burd* v. *Caritat* (g). Every day our own courts give it their sanction. They allow foreign assignees to sue, at least in the bankrupt's name for their use; and they would unquestionably disregard the bankrupt's release made at a subsequent day. Upon what ground can this be, unless an equity passed by the commissioners' assignment? The interest of all nations requires that this comity should be reciprocally shewn; and it would be with an ill grace disregarded here in reference to *England*, when reciprocity has at length come to be the only measure of the respect we shew to discharges of the person obtained under foreign laws. *Boggs* v. *Teackle* (h). Policy should lead us to adopt the rule. It is in favour of an equal distribution among creditors, and against particular preferences.

There is no case against us which ought to be regarded, because in none has the point been argued, or the authorities noticed. *Burk* v. *Maclean* (i), contains merely an opinion of Mr. *Dulany*. *Wallace* v. *Patterson* (k), cites no authorities, nor does the argument notice any principle. In *Harrison* v. *Sterry* (l), the Chief Justice says merely that foreign statutes do not operate a legal transfer. If they did, they would operate by relation; but this does not say that they are not equivalent to voluntary assignments, which pass an equity.

Arguments for the defendant in error. There are two questions in the case. 1. Whether the *English* statutes of bankrupt have taken away the right of the defendant in error. 2. Whether they have rendered ineffectual the remedy he has chosen.

They have not taken away his right. Supposing the contract to have been made in *England*, and with a view to performance there, this would not follow. The *lex loci* governs as to the form, the proof, and the construction of the contract, but not as to its discharge. The law that discharges a debt must have jurisdiction over the creditor.

| | | |
|---|---|---|
| (a) 4 *D. & E.* 182. | (e) 3 *Mass.* 517. | (i) 1 *Har. & M.* 236. |
| (b) 1 *H. Black.* 665. | (f) 1 *Johns.* 113. | (k) 2 *Har. & M.* 468. |
| (c) 1 *East* 11. | (g) 2 *Johns.* 342. | (l) 5 *Cran.* 289. |
| (d) 1 *Cook B. L.* 307. | (h) 5 *Binn.* 337. | |

When the question relates to enforcing the contract, it must be decided by the forum where the suit is instituted; and if there is nothing in that law opposed to it, it is of no importance that a foreign law would not enforce it. *Holman* v. *Johnson* (a), *Biggs* v. *Laurance* (b), *Piersoll* v. *White* (c), *Moland* v. *Fitzjames* (d), *Ruggles* v. *Keeler* (e), *Smith* v. *Spinola,* (f), 3 *Dall.* 369, 370. But the contract was made to be performed in the *United States.* It was there only that the deficiency or excess was to be ascertained, and where of consequence the defendant in error was to become a debtor or creditor. The law of this country must therefore govern.

The remedy has not been rendered ineffectual. The assignment by the *British* commissioners, in a controversy between them and a citizen of the *United States,* is entitled to no consideration. It transfers no right legal or equitable; and if any respect is shewn to it by the comity of this Court, it can only be where the case is between the assignees and the bankrupt himself, or the subjects of *England.*

The basis of the opposite argument is not solid. Though personal property has in general no locality, and although in respect to the transfer of it by the proprietor, the law of his domicil is in general respected, yet for the protection of its own citizens, and to enforce the payment of debts due by foreigners, every nation attributes to it a locality, and makes it submit to the operation of local laws. The process by attachment is built upon no other principle; and to illustrate it by a more striking case, in the event of an intestacy abroad, every nation requires an administration where the chattels of the intestate actually are, and then distributes not according to the foreign law, but its own. What clearer proof can there be, that to protect a domestic creditor, the law attributes a locality to debts due to a foreigner.

To give effect to the assignment is therefore to allow the statute an extra-territorial influence, in opposition to, universal practice, to the will of the bankrupt, to general convenience, and to justice.

The bankrupt laws of *England* are penal in their nature,

(a) *Cowp.* 341.          (c) 2 *Mass.* 84.          (e) 3 *Johns.* 263.
(b) 3 *D. & E.* 454.       (d) 1 *Bos. & Pul.* 138.     (f) 1 *Johns.* 198.

and are according to the opinions of learned men, and the decisions of courts, limited to their own territory. 2 *Kaimes Eq.* 361. *Huberus* in 3 *Dal.* 371. They do not, says Lord *Mansfield* in *Cleves* v. *Mills* ( *a* ), extend even to the colonies, but are considered there as voluntary conveyances by the bankrupt, and do not affect the rights of other creditors; voluntary, in the sense of being without consideration. *Le Chevalier* v. *Lynch* ( *b* ), was the case of a garnishee, who had paid money in the *West Indies* to a creditor resident there, under an attachment issued against the bankrupt's effects subsequent to a commission in *England*, and upon coming to *England* he was sued by the assignee: but he was held not liable. In *Mawdesly* v. *Parke*, cited in 1 *H. Black.* 680, it was expressly held that an assignment by the commissioners did not transfer a debt due in *Rhode Island*. And it is most reasonable that it should be so, because a discharge in *England*, the beneficial part of the system, does not relieve the bankrupt from his foreign debts, and therefore that part of the system which is onerous to him should not be enforced. *Quin* v. *O'Keeff* ( *c* ), *Pedder* v. *M'Master* ( *d* ), *Smith* v. *Buchanan* ( *e* ), *Proctor* v. *Moor* ( *f* ), *Vanraugh* v. *Vanarsdale* ( *g* ), *Smith* v. *Smith* ( *h* ). It would be most severe upon the bankrupt, to permit his assignees to take all his effects in the *United States*, and to leave him exposed to his creditors there.

The assignment by the commissioners is compulsory. The bankrupt takes no part in it. He does not even formally join them. All the proceedings are *in invitum.* It might as well be said that the robber suffers death voluntarily, because he voluntarily commits the crime, and assents to the law of his country.

It is not upon a good consideration as to debts due abroad, because it does not discharge him from them.

The cases of *Solomons* v. *Ross*, and *Jollet* v. *Deponthieu*, were in chancery, and do not seem to have been argued. The vicinity of *Holland* to *England*, probably rendered it convenient for those countries to respect each others' bankrupt laws; but convenience is the other way between *Great*

(*a*) 1 *Cook. B. Law* 303.　(*d*) 8 *D. & E.* 609.　(*g*) 3 *Caines* 154.
(*b*) *Doug.* 169.　(*e*) 1 *East* 6.　(*h*) 2 *Johns.* 235.
(*c*) 2 *H. Black.* 553.　(*f*) 1 *Mass.* 198.

*Britain* and the *United States.* Besides, the authority of those cases is entirely done away by *Mawdesly* v. *Parke.* The first of them was decided upon a principle now universally given up, that the property passess by relation to the act of bankruptcy.

In the *United States* there are four cases in point. 1 *Kirby's Reports* 313, in *Connecticut;* *McLane's case* (a), in *Maryland;* *Wallace* v. *Patterson* (b), in the same state; and *Harrison* v. *Sterry* (c), in the Supreme Court of the *United States.* In the last case, after distributing the fund first to creditors who had attached in the *United States,* after the bankruptcy in *England* and before the assignment, it was afterwards divided equally between *American* and *British* creditors without at all regarding the assignment.

All the *American* authorities cited by the plaintiff in error, are well reconciled by our position, that as between the bankrupt and his assignees or foreign creditors, comity will give effect to the assignment, and no further.

TILGHMAN C. J. *Moreton* the plaintiff below, claims under an attachment against the effects of *Topham* a merchant residing in *England.* A commission of brankrupt had issued against *Topham* in *England,* and the commissioners had made an assignment of his estate prior to the issuing of the plaintiff's attachment. The question is, whether the plaintiff can hold the bankrupt's effects against the assignees under the commission. The counsel for the assignees rest their defence on two points. First, that the contract having been made in *England,* the case must be decided by the law of *England.* Secondly, that by the assignment an equitable interest passed to the assignees, which will be protected against an attachment.

· 1. Although the transaction from which the plaintiff's claim arises, originated in *England,* yet the business was to be done in *America.* The plaintiff residing in *New York,* advanced money in *England,* and *Topham* to whom the money was advanced, made a consignment of goods to the plaintiff. The goods were to be sold, and the plaintiff's advance being deducted from the proceeds, the surplus was to be remitted to *Topham* in *England.* But it turned out, that the proceeds fell

1814.

MILNE
*v.*
MORETON.

(a) 1 *Harris & M'H.* 236.　(b) 2 *Harris & M'H.* 463.　(c) 5 *Cran.* 289.

1814.

MILNE
v.
MORETON.

short of the money advanced, so that contrary to expectation, the plaintiff remained the creditor at the winding up of the concern. Under these circumstances, it cannot be said that the parties looked to the law of *England;* and if they did not, there is no pretence for having recourse to that law. If a contract is made in one country with a view to its execution in another, it shall be governed by the law of the country where it is to be executed. Such was the opinion of Lord *Mansfield* in *Robinson* v. *Bland,* 2 *Burr.* 1079, in his reasoning in the case of a bill of exchange drawn in *Paris* payable in *London;* and the principle is correct, because it is the intention of the parties which should decide by what law they are to be governed. Where this intention is not expressed, it may be reasonably concluded, that they resort to the law of the country where the contract is to be carried into effect. But even if it had not been the intention to transact the business relative to the contract in *America,* I do not consider the principle of the *lex loci* as applicable to the case; because the dispute arises not on the construction of the contract, but on a collateral matter. In general a contract is said to be expounded according to the law of the country in which it is made; but here is no question about the contract, the controversy is concerning property of the debtor totally unconnected with the contract. In many respects the law of the country *where the action is brought,* must prevail. It will not be pretended that the defendant an *English* merchant, could plead the *British* statute of limitations in bar of the plaintiff's action. So if the *lex loci* gives particular privileges to certain classes of people, they lose them when they go out of the territory where the privilege exists. In *France* a merchant is not liable to imprisonment in actions of debt, except in certain cases. This law was pleaded here by a *French* merchant, on a motion to be discharged on common bail in an action on a contract made in *France;* but the plea was overruled. If the law of *England* is to govern the case before us, then it must govern not only the construction of the contract, but every other question which arises in the prosecution of the suit, a proposition too extravagant to be contended for. We must decide then according to *our own* law.

2. The second question is not so easily answered. It has never been decided in this state and is of great importance,

both as it respects our national character, and the amount of property depending on it. The assignees of *Topham* stand upon this principle, " that personal property has no locality, " but is transferred according to the law of the country in " which the owner is domiciled." This proposition is true in general, but not to its utmost extent, nor without several exceptions. In one sense personal property has locality, that is to say, if tangible, it has a place in which it is situated, and if invisible, (consisting of debts) it may be said to be in the place where the debtor resides; and of these circumstances the most liberal nations have taken advantage, by making such property subject to regulations which suit their own convenience. In cases of intestacy, the property is distributed according to the law of the domicil of the intestate. But yet so far as concerns *creditors*, it depends on the law of the country where it is *situated*. If an *Englishman* dies, and leaves property here, we regulate the order in which his debts shall be paid, according to our own law; the residue is distributed according to the law of *England*, and the *English* adopt the same rule with regard to foreigners leaving property in *England*. Every country has the right of regulating the transfer of all personal property within its territory, but when no positive regulation exists, the owner transfers it at his pleasure. We have no laws prohibiting foreigners from the free disposal of their personal property situated here. Therefore if *Topham* had made an assignment of his property in the hands of the garnishee, the case would not have admitted of a moment's speculation. For although in strict law, a chose in action is not assignable, yet it is in equity, and an equitable assignment made *bona fide* and for a valuable consideration will be protected against an attachment. This assignment however was not made by *Topham*, but by certain commissioners appointed by the lord chancellor, according to the law of *England*, which it is contended is equivalent to an assignment by himself, because every man is supposed to consent to the law of his country. An assignment by *law* has no legal obligation out of the territory of the *law maker*. But by the curtesy of nations, founded on principles of mutual convenience, the laws of one country are sometimes regarded in another. The extensive commerce of *England* has scattered the property of

1814.

MILNE
v.
MORETON.

her subjects all over the globe, and brought much of the property of foreigners within her own territory. Of consequence, questions have often been brought before her courts, concerning the operation of her own bankrupt laws in foreign countries, and the effect of foreign bankrupt laws on property in *England*. With respect to assignments under the *English* law, they never were held to operate as legal transfers of property out of *England*, not even in *Scotland*, *Ireland* or the colonies in *America*. *Cleve* v. *Mills*, 1 *Cooke* 303. Nor has it been denied that an inhabitant of one of the colonies, who has obtained judgment and execution against the effects of a bankrupt under a law of the colony, may hold against the assignees in *England*. *Waring* v. *Knight*, 1 *Cooke* 407. But if an inhabitant of *England* attaches the property of an *English bankrupt* in foreign parts, and thus obtains payment, he will be compelled to refund the money in an action by the assignees; *Sill* v. *Worswick*, 1 *H. Black.* 665., *Phillips* v. *Hunter*, 2 *H. Black.* 402., *Hunter* v. *Potts*, 4 *T. Rep.* 182; because residing in *England* and bound by the law of his country, it is against equity that he should defeat the object of that law, which is the placing of all creditors on an equal footing. As to assignments under foreign bankrupt laws, it was determined in the year 1764 in *Solomons* v. *Ross*, 1 *H. Black.* 331, and *Jollet* v. *Deponthieu*, 1 *H. Black.* 132, that the curators under a *cessio bonorum* in *Holland*, should be preferred to *English* creditors who attached the property of the bankrupt in *London*. No case has arisen between assignees under a commission in the *United States*, and *English* creditors claiming under an attachment; but it has been decided in the case of *Smith* v. *Buchanan*, 1 *East* 6, that a discharge under a commission of bankrupt in the *United States*, was no bar to the action of an *English* creditor for a debt contracted in *England*, and in *Pedder* v. *M'Master*, 8 *T. Rep.* 609, the Court of King's Bench refused to enter an *exoneretur* on the bail piece, although the defendant had been discharged under the bankrupt law of *Hamburg*, where he resided when the debt was contracted. It is true, that the *English* judges have often said in general terms, that assignees under foreign commissions were permitted to bring actions in *England;* and lord *Loughborough* in particular has contended for this principle in strong terms,

and declared that although foreign nations were at liberty to pay no more regard than they thought proper, to assignments under commissions in *England*, yet to disregard them, would shew a want of good policy and civilization. *Sill* v. *Worswick*, 1 *H. Black.* 693. Yet it must be confessed, that between countries situated at a great distance from each other, the subject is attended with considerable difficulties. This is felt by the *English* courts as well as our own; for in neither is a discharge under a foreign commission, considered as a bar to an action, and yet it would seem that in order to act with consistency, complete effect should be given to the foreign commission, which is not done while the bankrupt remains liable to an action. It was at one time supposed, that this complete effect should be given; for in *Pedder* v. *M'Master*, the opinion of lord *Mansfield* is said to have been given in the case of *Ballantine* v. *Golding*, as follows: " It is a general principle that where there is a discharge by the law of one country, it will be a discharge in " another." But when the principle came to be reduced to practice, it was found to be too extensive, and has been rejected in latter times, as appears by the cases which have been cited. In this state we have permitted *English* assignees to bring actions in the name of the bankrupt for their own use, and we have held, that *between British subjects*, a discharge under an *English* commission is a bar to an action here. *Harris & Price* v. *Mandeville, September* 1796. But this is the first case in which there has been a collision between the *English* assignees, and our own citizens claiming under an attachment. Neither do I know that an action of the kind has been directly decided in any state northward of *Pennsylvania*, although in the Supreme Courts of *Massachusetts* and *New York* it has been said in general terms, that an assignment by commissioners in *England* is equivalent to a voluntary assignment by the bankrupt himself. In *Maryland* the law has been long settled. *M'Lane's Case*, 1 *Har. & M'Hen.* 236., *Wallace &c.* v. *Patterson*, 2 *Har. & M'Hen.* 463. The assignment of the commissioners has no validity there against an attachment. If we are to give effect to an *English* commission in preference to an attaching creditor, I do not perceive on what ground we can refuse to adopt the principle of *relation* by which

the property is divested from the bankrupt and vested in the commissioners from the time of the commission of the act of bankruptcy. And yet this would be attended with inconvenience too great to be endured. I am forcibly struck too with the injustice of permitting foreign assignees to take the bankrupt's property from this country, leaving the bankrupt exposed to actions of his creditors here. This is not giving effect to the *whole system*, but maiming and deforming it; for while the bankrupt is compelled on pain of death, to make a fair surrender of all his property, it is intended to compensate him by a complete discharge from his debts.

As it seems impossible therefore consistently with former decisions, to adopt the proceedings under the *English* commission according to the spirit and intent of their law, and it appears that the *English* courts find the same difficulty in giving full effect to commissions of bankrupt in the *United States*, it is at least questionable, whether consulting the real convenience of both countries, it would not be best, to leave creditors to their remedy by attachment, permitting the assignees in other respects to have the benefit of the commission. But whatever might be my own opinion of the policy which an enlightened nation should pursue, I should find no small difficulty in deciding this case, were it not for the authority of the Supreme Court of the *United States* bearing directly upon the point. In the case of *Harrison* v. *Sterry and others*, 5 *Cranch* 289, there were conflicting claims between 1st, the assignees under an *English* commission; 2d, creditors in the *United States* who had laid attachments subsequent to the act of bankruptcy in *England*, but prior to the assignment by the commissioners; and 3d, other creditors who had issued no attachment. The attachment creditors were preferred to the other two classes, and the residue which remained after satisfying them, was distributed so as to put *all the creditors* as nearly as possible on an equal footing, without paying any particular regard to assignees under the *English* commission. I think it safest to rest on this authority; and am therefore of opinion, that the plaintiff is entitled to hold under his attachment against the claim of the *English* assignees. Of consequence the judgment of the District Court should be affirmed.

1814.

MILNE
v.
MORETON.

YEATES J. I feel little difficulty in declaring my sentiments, that the present question is not to be determined by the laws of *Great Britain*, excluding other systems of jurisprudence, and particularly our own political institutions. The *lex loci* forms a rule for the exposition of contracts, and in many cases governs exclusively; but not when made in one country to be carried into execution in another country.

Here the original contract was made in *England*. *Topham* a *British* subject resident in *England*, transmitted to the plaintiff *Moreton* an *American* citizen, resident at *New York*, a quantity of goods, through *Moreton's* agent in *Liverpool*, to be sold on commission, and received from the agent an advance in money on account. It turned out in the event, that the sum so advanced exceeded the net proceeds, on the sale of the goods, and the foreign attachment issued for the recovery of the balance. Now it is perfectly clear, that until the sales of the merchandize were finished in *New York*, and the concern there wound up, it could not be ascertained which of the parties was indebted to the other, nor what would be the precise balance between them. Although the transaction therefore commenced in *Liverpool*, it necessarily terminated in *New York*, and in this latter place the debt arose. This in my idea removes every consideration as to *Liverpool's* being the place, whose laws must guide our decision.

But another question presents itself, more difficult of solution. Shall the *mere* prior assignment of the effects of a bankrupt, in *Great Britain*, by the *commissioners there*, prevail against the attachment of an *American* citizen, laid upon the effects of the bankrupt in the *United States?* It is highly important, inasmuch as it involves our national character, and deeply interests every *American* trader. I have therefore given the subject every consideration in my power; and if the opinion I have formed shall be found to be erroneous, I cannot shelter myself under the pretext of inattention to the subject of inquiry.

The municipal laws of all kingdoms and countries have no binding force beyond their respective limits. Such regulations are purely territorial in their effect. It is not pretended that the *English* statutes of bankruptcy have a

MILNE.
v.
MORETON.

strictly legal operation in the *United States.* The claim of preference in this instance in favour of the assignees, is grounded upon what is called the *comity* of nations. A bankrupt in the eye of the law, from whatever source his misfortunes may have arisen, was anciently supposed to be criminal, and the system of bankruptcy has always been considered of a penal and confiscatory nature. The *English* books treat their statutes of bankruptcy as merely local, and confined in their operation to that particular portion of the kingdom, called *England,* not extending to their dominions abroad, nor even to *Scotland* in their *full vigour.* The assignment of the property of a bankrupt is a statutable conveyance for the benefit of his creditors generally, in proportion to their debts, and is co-extensive with the power of the legislature.

In two late cases in *England, Hunter et al.* v. *Potts,* 4 *T. R.* 182., and *Sill et al.* v. *Worswick,* 1 *H. Bl.* 665, it was decided, that if after the assignment of a bankrupt's estate, a *British* creditor knowing it, and residing in *England,* should attach the money of the bankrupt abroad, the assignees may recover it in an action for money received to their use. Another determination of the like nature took place in the chancery of *Ireland* previously, between *Neale et al. assignees* v. *Cottingham and Houghton,* 1 *H. Bl.* 132, *note.* The grounds of these decisions were, that the parties who had laid the attachment were *British* subjects, and during the progress of the business lived in *England,* and of course were bound by the laws of that kingdom, to which they must be presumed to have given their assent. Such persons therefore were not permitted to avail themselves of proceedings, which enabled them to counteract a general system of municipal jurisprudence, calculated for the common benefit of all the creditors. This Court adopted a similar principle in the cases of *Harris and Price* v. *Mandeville,* and *M'Guire* v. *Mandeville,* in *September Term* 1796, when they determined that a discharge by the bankrupt laws of *England* should protect the person of the bankrupt from bail in this state, where the plaintiffs were *British* subjects; and where the bankrupt had been held to special bail, an *exoneretur* was directed to be entered. But I am not aware of any instance in the *United States,* wherein common bail has been ordered in a suit instituted by an

*American* citizen, against one who has been declared a bankrupt, and obtained his discharge under the laws of a foreign country. It has been adjudged by this Court, that where one has been arrested, who had been discharged under an insolvent law of our sister state of *New York*, whose courts do not respect discharges under our bankrupt or insolvent laws, he shall not be discharged on common bail. *Fisher* v. *Hyde, September Term* 1801. The same principle has been pursued, where a discharge had been obtained in the district of *Columbia*, under the insolvent act of congress. *Walsh* v. *Nourse,* 5 *Binney* 381. But where a sister state acknowledges the effect of a discharge under our laws, no bail is required by us on the discharge of a defendant by the laws of such state. *Hilliard* v. *Greenleaf,* 5 *Binney* 336, *note, Boggs et al.* v. *Teackle, Ib.* 332. And in *England, B. R.* will not order an *exoneretur* to be entered on the bail piece, upon the ground that the debt was contracted while the defendant was resident in a foreign country, and before he became a bankrupt by the laws of that country, though he may have obtained his certificate there. The Court distinguished it from the case of *Ballantine* v. *Golding,* where it did not appear that both parties resided in *England,* whereas in the case then before them, the plaintiff was resident in *England. Pedder* v. *M'Master,* 8 *Term Rep.* 610. In *Smith et al.* v. *Buchanan et al.,* 1 *East* 11, it was resolved, that a discharge under a commission of bankrupt is no bar to an action for a debt arising in *England* against the bankrupt, by a creditor an *English* subject, although the courts there so far give effect to foreign laws of bankruptcy, as that assignees of bankrupts deriving titles under foreign ordinances, are permitted to sue in *England* for debts due to the bankrupt's estates; because the right to personal property must be governed by the laws of that country where the owner is domiciled. And in *Potter* v. *Browne,* 5 *East* 131, lord *Ellenborough* says, " we " always import together with their persons, the existing " relations of foreigners as between themselves, according " to the laws of their respective countries; *except indeed* " *where those laws clash with the rights of our own subjects* " *in England, and one or other of the laws must necessarily* " *give way, in which case our own is entitled to the pre-* " *ference.*

1814.

MILNE
v.
MORETON.

In *Sill et al.* v. *Worswick*, already cited, Lord *Loughbo rough* in 1 *H. Bla.* 693, says, " It by no means follows that a " commission of bankrupt has an operation in another coun- " try against the law of that country. I do not wish to have " it understood, that it follows as a consequence from the " opinion I am now giving, (I rather think that the contrary " would be the consequence of the reasoning I am now " using), that a creditor in that country, not subject to the " bankrupt laws, nor affected by them, obtaining payment of " his debt and afterwards coming over to this country, " would be liable to refund that debt. If he had recovered " it in an adverse suit with the assignees, he would clearly " not be liable. But if the law of that country preferred him " to the assignees, though I must presume that determina- " tion wrong, yet I do not think, that my holding a contrary " opinion would revoke the determination of that country, " however I might disapprove of the principle on which the " law so decided."

The case now before us, presents to our view, these important prominent features. The defendant in error was an *American citizen, resident in New York, where and when this debt arose* in my idea. The parties now stand on their several legal rights; and the question therefore is narrowed down to one point, shall the assignment of the commissioners in a foreign county prevail in such a case, against the attaching creditor here?

Much reliance has been placed by the counsel of the plaintiff in error on *Solomons* v. *Ross*, 1 *H. Bla.* 131, *note a*, and *Jollet and Reitveld* v. *De Ponthieu and Baril*, *Ib.* 132, wherein the *cessio bonorum* of a bankrupt in *Holland*, was preferred to a subsequent attachment laid on the bankrupt's effects in *England*. The first case carries the doctrine to an unwarrantable extent, by applying the *relation* to the time of the *Deneufville's* stopping payment, and not to the time of the chamber of desolate estates taking cognizance thereof, which relation is not justified by the laws of *Holland*, where the bankrupt's effects vest in the curators, from the time of their appointment. 1 *H. Bla.* 132, *note, Cooke's Bank. Law* 307. Although these cases be considered as law, I think they may be distinguished from that before us. The *cessio bonorum* in *Holland* follows the *Roman* law, and is made

by the bankrupt himself. *Beawes' Lex Mercat.* 608, 612, 4*th edit.*, *Instructions of the states of Holland and West Frize to the commissioners of desolated estates. Art.* 38., 2 *Black.* 473. But the assignment was made by the commissioners under the provisions of municipal regulations merely territorial. It is one thing to assert, that assignees of bankrupts under foreign institutions, should be allowed by the courtesy of nations to support suits, as the representatives of such bankrupts, for debts due to them; and it is another thing to give efficacy to those institutions, to cut out attaching creditors, although posterior in point of time, who have commenced their proceedings under the known laws of the government to which they owed allegiance, and from whom they were entitled to protection.

It was remarked during the argument, that no good reason can be assigned, why an assignment by the bankrupt himself should prevail, and not the present one as made by the commissioners, which ought to be considered as equivalent thereto, and be deemed a *voluntary* conveyance made by the bankrupt himself, for a valuable consideration. The difference appears to me sufficiently obvious. Effect is given to the fair assignment of the bankrupt himself, because it is the spontaneous act of the party having the full dominion over the property, transferring an equitable if not a legal title thereto, after which his interest therein necessarily ceases, and is no longer subject to an attachment. It is wholly superfluous to cite *Justinian, lib.* 2. *tit.* 1. *s.* 40, to shew that nothing is more conformable to natural equity, than to confirm the will of him, who is desirous to transfer his property to another. But effect cannot be given to the assignment by the commissioners, unless we adopt the *British* statutes of bankruptcy, as laws binding on ourselves, although they were not considered to affect us, when we were the colonies of *Great Britain*; and this too, when their operation would manifestly interfere with the interests of our own citizens. It may also be asked in return, why shall this statutory assignment have the efficacy of vesting in the assignees the effects of the bankrupt, however distant, and thus protect them against foreign creditors who have neither received nor even claimed dividends under the commission, and yet a regular certificate of full conformity to

1814.

MILNE
v.
MORETON.

the statutes shall not protect the person of such bankrupt from arrests in our courts, at the suits of such creditors? It was not pretended on the first argument, that the doctrine of *relation* to the act of bankruptcy committed, which is expressly enacted by the *British* statutes, can possibly hold here, operating on goods or effects within the *United States;* and yet if those statutes on the ground of want of locality of such goods or effects, are to be operative, they should be extended in their full force, without limitation to their effect. The attachment at the suit of an *American* citizen brings in the foreign bankrupt; but if the latter enters special bail, he cannot plead his discharge in bar of the demand. Shall we recognize the act of the commissioners in *Europe*, as effectual to transfer a debt incurred in the *United States*, and thereby deprive the creditor of all hopes of enforcing payment of his demand, in our own tribunals?

That anxiety has been shewn by *British* judges to extend the operation of the *British* statutes of bankruptcy beyond the kingdom of *England*, and particularly by Lord *Loughborough* in *Sill et al.* v. *Worswick*, 1 *H. Black.* 690, I will not deny. The general tendency of the cases is, that *British* subjects although resident abroad are bound by the laws of their own country; and I have no objection to the doctrine, confined within those limits. The two cases on which in point of authority the plaintiff's strength lies, are *Solomons* v. *Ross*, and *Jollet & Reitveld* v. *Deponthieu & Baril*, before cited. On the most diligent search, I can find no other adjudications which go to the same extent, as to the effect of foreign ordinances; and the principle of those cases seems impugned by other decisions.

In *Scotland*, it is observed by Lord *Kaimes* in his *Principles of Equity*, *p.* 363, 2*d edit.*, that the statutory transference of property, even from the bankrupt to the commissioners, cannot convey any effects in that kingdom, although the *English* statutes are not there totally disregarded. In *Cleve* v. *Mills*, 1 *Cook's Bank. Laws* 303. 4*th edit.*, Lord *Mansfield* said that the statutes of bankrupt did not extend to the colonies, or any of the king's dominions out of *England;* the assignments under such commissions took place between the assignee and the bankrupt, but did *not affect the rights of any other creditors.* This was settled in many

cases, and particularly in *Wilson's* bankruptcy, wherein Lord *Hardwicke* declared, that the creditors had a right to affect the estate in *Scotland*, and get the advantage of the general creditors, notwithstanding the commission in *England*, although he would not permit them to come in under the commission till the other creditors were made even with them. *Wilson's* case is also mentioned with approbation in *Waring* v. *Knight*, Ib. 307., and in *Le Chevalier* v. *Lynch*, *Doug.* 161, (170) wherein it was adjudged, that money owing out of *England* to a bankrupt, might be attached by the law of the place *after the bankruptcy*, for a debt due *before the bankruptcy.*

In *Hunter* v. *Potts*, 4 *T. R.* 190, the defendant's counsel puts the very case now before us as not admitting of doubt; and the Court do not appear to deny the correctness of his remarks. " If," says he, " a subject of *Rhode Island* had " been a creditor of the bankrupt, it is not to be supposed " that the courts of law would have turned him round to " seek his remedy under the commission in *England*, if " even *after* the commission here issued, he had attached " the property of the bankrupt there."

In *Mawdesley* v. *Park & Beckwith*, *assignees of Campbell & Hayes*, cited by Serjeant *Hill*, *arguendo*, in *Sill et al.* v. *Worswick*, before mentioned, and stated at large in 1 *H. Black.* 680, it was held by the lords commissioners *Smythe* and *Bathurst* at *Lincoln's Inn Hall*, December 13th 1779, that the assignment of the commissioners did not divest the property out of the bankrupt, as the debt was due in *Rhode Island*, but only gave the assignees *a right to sue for it*, who having commenced a suit first, and recovered judgment there, had *gained a priority* over the defendants; and this although the case of *Solomons* v. *Ross*, and *Jollet et al.* v. *Deponthieu et al.*, are admitted to have been decided differently.

And in *Smith et al.* v. *Buchanan et al.*, 1 *East* 11, before cited, lord *Kenyon*, after stating that assignees of bankrupts, deriving titles under foreign ordinances, are permitted to sue in *England* for debts due to the bankrupt's estate, mentions the opinion of lord *Talbot*, that though the commission of bankrupt issued in *England*, attached on the bankrupt's effects in the plantations, yet his certificate would

not protect him from being sued there for a debt arising therein.

In *Bush et al.* v. *M'Clain*, 1 *Harr. & M'Hen.* 236, the opinion of *Daniel Dulany* Esq. is given, wherein he distinguishes between plaintiffs resident in *Great Britain*, taking out attachments against the effects of bankrupts in *Maryland*, and *country creditors* pursuing the same measure; and the Court acted on that distinction.

And in *Wallace et al.* v. *Patterson*, 2 *Harr. & M'Hen.* 463, where three persons residing in *England* became bankrupts, and had effects in *Maryland*, it was adjudged, that an attachment would lie by a citizen of *Maryland* against one third part of the effects, to satisfy a debt due to him by one of the partners, and contracted in *England*.

I now proceed to the case of *Harrison* v. *Sterry et al.*, adjudged in the *Supreme Court of the United States* in *March* 1809, upon an appeal from a decree of the Circuit Court for the district of *South Carolina*, upon a bill *in equity* by *Harrison* for relief. The case in the Circuit Court is reported in *Bee's Admiralty Decisions* 244, and on the appeal, in 5 *Cranch* 289. Six different classes of creditors claimed the effects in question: 1st. *Harrison* the complainant, under a deed from *Robert Bird* in his own right and as attorney of *Henry Mertens Bird* and *Benjamin Savage* his co-partners, dated 3d *December* 1802, and on a similar instrument of writing without seal, signed by *Robert Bird* in behalf of the *English* and *American* firm, dated 31st *January* 1803. These were considered as fraudulent acts on the bankrupt laws, being made in contemplation of bankruptcy, and consequently void. 2d. The *United States*, who were declared entitled to a priority under the act of congress of 3d *March* 1797, sec. 5. 3d. The *American*: and 4th. *British* creditors, who had attached the effects of the partnership in *South Carolina* on the 2d, 15th, 16th and 23d days of *April* 1803. *Robert Bird* alone had become a bankrupt under the laws of the *United States*, and his interest of one third in the funds of the company, was unaffected by the attaching creditors, but passed to his assignees, subject to the claim of his co-partners upon a settlement of accounts. The lien of the attaching creditors upon this one third was removed by the bankrupt law of the *United States*. 5th. *Sterry*

1814.

MILNE
*v.*
MORETON.

and others, assignees of *Henry Mertens Bird* and *Benjamin Savage*, under a *British* commission of bankruptcy. The bankruptcy of *Bird, Savage* and *Bird* in *London* was declared on the 12th of *June* 1803, and a commission issued. On the 6th of *February* preceding they had stopped payment. 6th. *Aspinwall* and others assignees of *Robert Bird* claimed under an *American* commission of bankruptcy. The house under the firm of *Robert Bird* and *Co.* stopped payment at *New York* on the fifth of ¡*December* 1803. *Thomas Parker*, who by consent of the creditors, had been appointed an agent for all the parties concerned, to collect and receive the debts due to *Bird, Savage* and *Bird*, was also made a party in the appeal.

In 5 *Cranch* 302, *Marshall*, Chief Justice, thus expresses the opinion of the whole Court, " as the bankrupt law of a " foreign country is *incapable of operating a legal transfer* " of property in the *United States*, the remaining two thirds " of the fund are liable to the attaching creditors, according " to the legal preference obtained by their attachments." ·

It has been contended by the counsel for the plaintiff in error, that the word *legal*, used in the preceding sentence, is contra-distinguished from *equitable*, and must be understood in that sense. This does not appear to me correct, although I have had frequent occasion to lament the imperfection of human language, used by persons of the most discriminating minds, and habituated to accuracy of speech. It would seem wholly unimportant to distinguish between *legal* and *equitable* effects, upon an appeal from a decree in equity on those effects in the particular case. I know of no equity arising from a transfer under a foreign law, which does not arise *proprio vigore*. It is agreed that the expressions, however general, are to be referred to the circumstances of that case. I take the plain meaning of the words of the Chief Justice to be, that a foreign law cannot transfer property in the *United States*, and this I think, will most clearly appear from the conclusion of the decree. " With " respect to any surplus which may remain of the *two* " *thirds*, after satisfying the *United States* and the attach- " ing creditors, it ought to be equally divided among all " the creditors, so as to place them on an equal footing

" with each other. The dividends paid by the *British*
" assignees, and those made by the *American* assignees
" being taken into consideration, this residuum is so to be
" divided between them, as to produce equality between the
" respective creditors."

It is true, the attachments of the creditors were laid on
the effects at *Charlestown*, previously to the issuing of the
*English* commission against *Bird, Savage* and *Bird,* but
that house stopped payment in *London* on the 5th of *Feb-
ruary* 1803. How comes it then, that this commission did
not effect an *equitable* transfer of the effects of the firm in
the first instance, after payment of the debt due to the
*United States,* by relation to the act of bankruptcy in *Lon-
don,* according to the doctrine asserted by the concluding
counsel of the plaintiff in error? Or if the doctrine of *rela-
tion* is not contended for, according to the argument of the
counsel who preceded him, how does it happen, that after
satisfying the *United States* and the attaching creditors, the
residue was not ordered by the Court to be paid over to the
*British* assignees, if the effects were equitably transferred by
the *British* commission upon the principle of comity? Why
are all the creditors put upon an equal footing? I know of
no satisfactory answers which can be given to these ques-
tions, unless on the concession, that the bankrupt law of a
foreign country is incapable of operating any transfer,
whether *legal* or *equitable,* of property in the *United States.*
I have been thus minute in my observations on this case,
because it has had considerable effect on my mind, in form-
ing my judgment upon the subject before us. I regard it as
a case in point, decided with unanimity in the highest Court
in the Union, to whose jurisdiction the interests of foreign-
ers are peculiarly intrusted.

I admit that the *American* as well as *British* decisions
assert, that the assignees under a foreign commission of
bankruptcy are considered as the substitutes of the bank-
rupt, and may support suits in their own names. As be-
tween the bankrupt and debtor, this operation is fair, pro-
vided the debtor is made safe in his payment; but when it
is extended further, and thereby affects the rights of stran-
gers, it assumes a different character. The *British* courts
will not permit the subjects of that kingdom to contravene
their bankrupt system; but unless in the two cases of *Solo-*

*mons* v. *Ross*, and *Jollet et al.* v. *Dèponthieu et al.*, I know
of no decisions which attribute this extra-territorial effect
to foreign laws and institutions.

I fully agree, that we should pay sedulous attention to the
*comity* of nations. Such courtesies tend to harmonize man-
kind, promote public convenience, and enlarge the circle of
human happiness in a social state. But our complaisance
should be confined to reasonable and temperate limits. At
all events I would be fully satisfied, that the *British* courts
sustain the doctrine contended for by the plaintiff in error,
as to the effect of *our own* bankrupt system, before I give
my assent thereto. Reciprocity in such instances is true
equity as well as sound policy. That fact remains yet to be
ascertained, and I avow my incredulity. Persons trading to
*England*, and coming there occasionally, although not resi-
dent in that kingdom, may be declared bankrupts by their
laws. *Cowp.* 402., 1 *Atk.* 82. It is well known, that their
practice has been conformable thereto. All intervening acts
between the act of bankruptcy committed, and the assign-
ment by the *British* commissioners, as to the personal pro-
perty of the bankrupt, are avoided by the *English* statutes.
*Cook's Bank. Law* 584. The effects of such a doctrine, ope-
rating on such property in a foreign country, are too obvious
to require any detail. Persons feel the difficulty of proving
debts under a commission of bankruptcy among ourselves.
How much must it be enhanced, when those proofs are to
be made in *Great Britain*, at the distance of a thousand
leagues from the scene of the transactions. In times of war
between the two countries, dividends would not be paid in
*England*. My feelings are repugnant to sending our citizens
to foreign tribunals, to recover their debts, when full justice
may be dispensed to them in their own country; and I can
discover no uniform imperious rule, which enjoins this
hardship upon them.

Upon the whole, on the fullest reflection, I do not see my
way sufficiently clear, to subject our citizens to such embar-
rassments and inconveniences, upon the principles of a *sup-
posed comity;* and I am therefore of opinion, that the effects
in the hands of the garnishee were liable to the attachment
of *Moreton*, notwithstanding the bankruptcy of *Topham*,
and that the judgment of the District Court be affirmed.

1814.

MILNE
v.
MORETON.

BRACKENRIDGE J. Take the case to be that the contract was made here, that is, in this state, money advanced to *Topham* or his agent here to be satisfied by the shipment of goods from *England*, and the goods not shipped to satisfy according to the contract; (for not being shipped to the whole amount of the sum advanced, the contract cannot be said to be wholly satisfied;) in that case, *Topham* became indebted for the deficiency, and not having a domicil here, so that he could be arrested, his property became liable to an attachment to compel an appearance. But the property attached had ceased to be his before the attachment did attach, and it is admitted, and could not but be admitted by intelligent counsel, that a transfer for a valuable consideration by himself before the attachment, would exclude it. By operation of law, the consequence of an act of bankruptcy on his part, the property was transferred, and the attachment excluded. *Topham* a merchant in *England* was subject to the bankrupt law of *England*, and an act of bankruptcy on his part, had wrought a forfeiture of his effects for the use of his creditors. I take no distinction between the act of law transferring, and his own act. He committed the act of bankruptcy, and the law operating on this, transfers. It works an alienation. It is his own act, what the law does for him, because he must be considered as having originally given an assent to this law which operates the transfer, if it were necessary to recur to the subtlety of first principles in the case, to prove the act of law to be the same thing as a voluntary act on his part. But I lay out of the question all idea of voluntary or compulsory. He did the act to which the law annexes the consequence and effect of a *transfer*.

The property attached was the property of *Topham* at the act of bankruptcy. It was his, with as complete an ownership as he would have had over it in *England*. There is no law here to secure that property from his own transfer, and for the use of his creditors here. It can therefore make no difference, whether he himself has transferred, or his own law for him. In contemplation of law it is his act. There is no *lex loci* bearing on the contract. The *locus contractus* has nothing to do with the case. The question respects the property, whether it remained his, or was transferred at the time of laying the attachment. If it were material, I would

say the contract was made in England. It was not until the money advanced came to the agent of *Topham* in *England*, that by his agent he could be considered as assenting and becoming a party to the contract. A contract requires parties, and the union of two or more minds; and it could be only by accepting the money advanced, that he could be considered as assenting to the contract to ship goods. It was only on this act that the law could raise the implication of a promise.

Whether a debt due from an individual of a *home* government, to a creditor in foreign parts, on a contract in foreign parts, is discharged by the certificate, where the creditor in foreign parts does not come forward to prove his debt under the commission, it is not necessary in this case to say; for I am clear, that the interest attached in this case was transferred by the act of bankruptcy, and was no longer in him, so that it could be attached for his debt. The attachment itself, even supposing it *before the act of bankruptcy*, could not appropriate, and nothing could do it short of a judgment; but the act of bankruptcy here was before even the attachment laid, so that there can be no question.

An interest arising on a contract here, unless there is some law with us to exclude it, follows the person as much as the ownership of a chattel. There is no difference between a chose in action, and a chose in possession, in this respect. As to the *locus contractus* and *lex loci*, it must be immaterial, except so far as *affecting the consideration of the contract, the evidence or the enforcement of it, or the right of transferring and carrying it out of the country.* There being nothing of this kind in the way here, it is transferred by the bankruptcy, and is the same thing as an *interest arising on a contract in England.* The domicil of the owner draws personal property with it, and it is the same thing as if in the home government.

*Trahit additque acervo.*

He drags it to his domicil. This is the principle upon which I put the case, and which is abundantly recognized by the law of *England;* and by the decisions of this Court.

If there is any *dictum* of a judge of the courts of the *United States*, or even a decision, which would seem to break in upon the unity and simplicity of the system, I shall see

1814.

MILNE
v.
MORETON.

more about it, before I shall be disposed to follow it, I cannot think it has been well considered by the judges if such decision has been made. As to the inconsistencies of *English* judges, I should pull an old house over my head, were I to give myself the trouble to look into them; I confine myself therefore to reason and principle.

Judgment affirmed.