ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

---

RICHARD ABRAHAM, impleaded, &c. *appellant*, and C. B. PLESTORO and others, *respondents*.

An *assignee* under a foreign commission of bankruptcy is not entitled before judgment to an *injunction* to restrain the *bankrupt* from receiving from the custom house here, property which was on the high seas on board a vessel, on its way from England to New-York at the time of the suing out of the commission. *Per curiam.*

An assignment under the bankrupt law of *England* does not operate a legal transfer of the personal property of the bankrupt *in this country*, even as between the *assignee* and the *bankrupt*. *Per* MAYNARD, OLIVER and STEBBINS, *senators.*

If the property be on board a *British* vessel on the high seas at the time of the suing out of the commission, and thus within the jurisdiction of England, it passes by the assignment; but if so, the fact must be distinctly averred, and will not be presumed. *Per* MAYNARD and STEBBINS, *senators.*

The assent of a bankrupt to a statutory assignment of his property is not to be presumed, while the proceedings are yet *in fieri*. *Per* MAYNARD and OLIVER, *senators.*

If the same effect be given to a *statutory assignment* as to a voluntary conveyance, the assignee is not entitled to an injunction before judgment. *Per* OLIVER, *senator.*

*Principles contained in the opinions of Mr. Justice* MARCY *and Mr. Senator*
THROOP, *dissenting from the opinion of the majority of the court.*

1. An assignment under a commission of bankruptcy sued out in England against a *British* subject, domiciled in that country, divests the bankrupt of personal property of which he is possessed *in this country* and transfers it to the assignee. So property in a vessel on the high seas in like manner passes. *Per* MARCY, J. and THROOP, *senator.*

2. An *injunction* may properly issue from chancery in such case to restrain a custom-house officer, into whose hands the property comes, from delivering it to the bankrupt. *Per* MARCY, J. and THROOP, *senator.*

3. The same effect should be given by our courts to a *statutory* assignment under a foreign act of bankruptcy as to a *voluntary* assignment, where all the parties are subjects of the country under the laws of which the assignment is made, and their rights grow out of contracts made within the jurisdiction of their own government. *Per* MARCY, J. and THROOP, *senator.*

4. Personal property is without locality, and is governed by the laws of the country where its owner is domiciled, except where, by the laws of the country where it is situated, it is subjected to the claims of the citizens of such country for satisfaction of their just demands: as to such claims a statutory assignment under a commission of bankruptcy creates no *lien;* but as to the bankrupt, all his property and choses in action throughout the world, and his power over it, is taken away and the assignee under the commission is substituted in his stead. *Per* MARCY, J. and THROOP, *senator.*

An assignee of a *foreign* bankrupt may sue here in a court of equity if not in a court of law in his character of assignee. *Per* THROOP, *senator.*

After the assssignment the bankrupt holds the assigned property, subject to the title of the assignee, and becomes by operation of law the agent of the assignee. *Per* THROOP, *senator.*

APPEAL from chancery. The bill was filed on 24th September, 1828, by Charles Berners Plestoro and eight others, creditors of the appellant, and James Johnstone, an assignee under a commission of a bankruptcy sued out in England against the appellant. The bill, after stating that the parties were subjects of the king of England, domiciled in that country and setting forth the debts due to the several creditors, averred, that in the month of July, 1828, the appellant absconded to avoid being arrested at the suit of his creditors; that Plestoro, a creditor to the amount of £3500 sterling, procured a commission of bankruptcy to be issue; that on the 8th of *August* the commissioners declared the appellant a bankrupt, and on the same day executed a deed of assignment of his estate to James Johnstone, whereby the same, by the laws of England, became vested in him in trust for

the creditors of the appellant ; that the appellant had lately arrived at the city of New-York, having brought with him on board the ship Great Britain, French, master, sundry mer-chandise, goods and chattels, to wit, 22 packages and cases of paintings, one case of medals and books and one case con-taining paintings and cabinet furniture, which goods it was alleged were in a public store, under the power and custody of the collector of the customs for the port of New-York. The bill further stated, that suits, had been commenced in the names of the creditors against the appellant in a court of the city of New-York for the debts due to them respectively ; that the appellant had been arrested and the suits were pend-ing ; that the witnesses necessary to prove the debts reside in Great Britain, beyond the jurisdiction of the courts of this state. The bill prays a discovery as to the several matters alleged in the bill ; that the collector of the customs may be decreed to deliver the goods to Johnstone the assignee, upon payment of the duties, and that in the meantime an injunction issue, restraining the collector from delivering the property to the appellant, and forbiding the appellant from suing for receiving the same until the order of the court. An injunction issued according to the prayer of the bill.

In the answer of the defendant he admitted the debt of *Plestoro* and some of the others, but denied others of the debts set forth in the bill. He denied that he quitted Eng-land clandestinely ; or absconded with a view to elude his creditors ; on the contrary, he averred that he left England for the sole and only purporse of pursuing and extending his busi-ness ; that his departure and mode of travelling in England after he left London, the place of his residence, was open and public and in the way of business ; that he publicly and invariably gave out, both before leaving London and on the way, that he was coming out on a venture to the United States of America ; that he had his merchandise publicly and regularly entered at the custom-house in Liverpool, from whence he sailed bound to the city of New-York, the goods being consigned to himself at the latter port ; that he left his address for the city of New-York to such as were concerned

in knowing where he was to be found, announcing his intention, in which he was sincere, of returning to England in November then next; that he left persons in the mean time to carry on his business with a large capital for that purpose, more than sufficient to pay all his debts, and that every part of his conduct from first to last, as regarded the property in question and his adventure to this country had been fair and bona fide in the regular pursuit of his business as a merchant, with a view to better his circumstances; and that he knew and believed himself to be perfectly solvent and able to pay all his lawful debts, in case the property he left behind had not been sacrificed and his credit ruined by the proceedings of the complainants. He denied all knowledge of the suing out of the commission of bankruptcy and of the assignment under it, except what was derived from the complainants' bill; he admitted his arrival with the property in New-York and its deposit in the custom-house; and that he had been sued as stated in the bill, nine several suits having been commenced against him in the name of the complainants respectively, except Johnstone, and that, as he alleged, to oppress and ruin him and deprive him of his liberty, the suits were brought for large nominal sums, and particularly that of Plestoro, in which $30,000 was demanded, and the others in proportion, and that in consequence thereof he was in close custody. He insisted that the commission of bankruptcy, if issued, had issued *improvidently* and *illegally*, and ought not to prejudice him in this country; and he submitted whether he was bound to account to the complainants *jointly* on the ground of the allegations stated in the bill.

On the 7th October, 1828, the appellant, on due notice, applied to the chancellor for a dissolution of the injunction; and on the 21st of the same month the chancellor denied the motion, with costs to be paid by the appellant, and made an order accordingly. The reasons for which decisions will be found in 1 Paige's Ch. R. 236. From this order the defendant below appealed.

*D. Graham,* for appellant. The injunction should have been dissolved on the ground of the multifariousness of the

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

matter contained in the bill; the mixing up of the claims of creditors and of an assignee under a commission of bankruptcy. The defendant below might have demurred, but was equally entitled to urge this objection on answer. Several distinct and unconnected parties cannot unite in a bill. Strike out the names of the creditors, as suggested by the chancellor, and the assignee stands alone; without the bankrupt he cannot sue, and yet here he sues the bankrupt, the very person whom he represents. (1 Johns. R. 118. 2 id. 345. 20 id. 259.)

The assignment is an *incipient* proceeding. The power of the assignee first appointed is limited to 42 days, when another may be substituted, and the bankrupt himself may come in at any time within 12 months and dispute the whole proceeding. (Bankrupt act of England, 6 Geo. 4, ch. 16, passed 2d May, 1825, § 92.) The question presented therefore is, whether our courts will carry into effect the bankrupt law of England and regard any proceeding under it before a final and conclusive order has been made. If not, it is of course to dissolve the injunction and to dismiss the bill. Otherwise the court are bound to adjudicate upon the act and to determine the rights of the parties under it. This, it is presumed, they will not do, as it is not in their power to see that justice shall be done; the funds of the bankrupt in England are beyond their reach, the assignee is not subject to their control, and the creditors of the appellant, not parties to the proceeding here, will not be bound by it. The bill therefore should be dismissed.

The bill discloses no equity. The statute under which the commission issued should have been pleaded, and the preliminary proceedings set forth, shewing that the commission duly issued in accordance with the statute. The assent of the creditors to the filing of the bill should have been averred. (§ 88.) The creditors having brought their suits at law, are debarred from claiming under the commission. (§ 59. 1 Rose on Bankruptcy, 184, 394. 2 id. 421. 16 East, 252.) Whatever might have been the effect of the assignment upon the property of the appellant in England, it has not the effect of operating a legal transfer of his property here. The

bankrupt law of England is in its nature and origin penal, and our courts are not bound to enforce it, or to give effect to the assignment on the assumed ground of its being equivalent to a voluntary act of a party over his own property. The rule of comity tendered to us by Great Britain on this subject has not been accepted or adopted by the courts of our country. (20 Johns. R. 229, 260, 266.) The assignee would not be entitled to an injunction under the bankrupt law, even in England ; and the creditors at large had no right to ask for it. (2 Johns. Ch. R. 144. 1 Hopkins' Ch. Rep. 365.)

*P. A. Jay,* for respondents. By the law of nations, every state is bound to do justice to the citizens or subjects of another state. By the law of England, a foreign assignee of a bankrupt is entitled to the property of the bankrupt in England, even in opposition to British subjects who have attached such property, where the attachment is subsequent to the vesting of the rights of the assignee. (1 H. Black. 691. id. 132. id. 131. 1 Douglass, 169, 4 T. R. 182. 2 H. Bl. 402. 1 East, 11. 8 Vesey, 82. 1 Rose's Bank. Cas. 462. 2 id. 99, 234, 313.) [The reader is referred to 20 Johns. R. 242 to 248, for the comments of the counsel upon the cases cited ; the same counsel having, in a case there reported, quoted and commented upon the cases now cited by him.] This doctrine is fully recognized as the law of this state by Chancellor Kent, in the case of *Holmes &c. vs. Remsen, &c.* ( 4 Johns. Ch. R. 460.) Mr. Justice Platt, in a case between the same parties and involving the same questions, ( 20 Johns. R. 254,) differs in opinion with Chancellor Kent as to the rule of law which should prevail in cases of conflicting claims between foreign assignees and domestic creditors, but he unqualifiedly admits that as to the bankrupt himself, the maxim that " every man is presumed to be assenting and a party to the laws of his own country," applies, and is just and proper ; the consequence of which is, that effect should be given to the assignment as being in execution of laws by which the bankrupt is bound.

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

The case of *Bird* v. *Caritat*, (2 Johns. R. 344,) does not decide that the assignee must sue in the name of the bankrupt. It is there said the suit *may* be, not that it *must* be in the name of the assignee or of the bankrupt. Besides, here the suit is not on a chose in action, but for the recovery of goods. There the action was at law; here it is in equity, where the assignee may always sue in his own name. The assignee may sue in his own name. (3 Mass. Rep. 517. Cooper's Pl. 34.) All legally or beneficially interested may be made parties. *Cestuis que trust* may therefore be made parties. There is no case to be found which decides that because improper parties are joined, the bill must be dismissed. The bill is not *multifarious;* for though the parties are disconnected in the substratum of the action, the remedy is joint. It is like a bill by creditors whose demands are separate, calling a trustee to account. The bankrupt act is sufficiently referred to in the bill by his title. In all cases of contract, the *lex loci contractus* and *lex domicilii* of foreign debtors must of necessity be passed upon by the courts here. (2 Johns. R. 198. 3 id. 263. 7 id. 118. 11 id. 194. 14, id. 338, 346. 1 Caines, 412. 2 Cowen, 626. 4 id. 508, n.)

*D. B. Ogden*, in reply. At the time of the issuing of the commission, the goods were on the high seas. Had they been on board of a *British* vessel, it would have been so averred. In the absence of such averment, the fair conclusion is that the vessel in which they were embarked was *American;* and if so, the goods were as much within our jurisdiction as if landed in a store house at New-York. Unless, therefore, the assignment passes personal property out of the jurisdiction of England, the property in question did not pass to the assignee.

The proposition of Lord Loughborough, in 1 H. Black. 690, that personal property is governed by the law which governs the person of the owner, is denied in the broad terms in which it is advanced. It is true as to the succession or distribution of it, but not as to the collection of it. It must be collected according to the laws of the country where it happens to be.

A *voluntary* assignment is an assignment by the bankrupt himself, as contradistinguished from an assignment by act or operation of law. The case in 1 H. Black. 131, 2, was that of an assignment by the bankrupt. So in 4 Johns. Ch. R. 469, such assignment was held good. 1 H. Black. 691, puts the assignment by operation of law upon the same footing with an assignment by the bankrupt himself. The question there, however, was between the assignee and the creditors. But can an assignment be presumed to be *voluntary* when the reverse is shewn? Unless it is voluntary, it does not pass property *extra territorium;* and on the presumption that the assignment was voluntary, the property here is taken out of the hands of the appellant, and if the claim be allowed, it can only be because the British bankrupt act is in force here.

Chancellor Kent held, in 4 Johns. Ch. R. 466, that an assignment in England passed the property here. In 20 Johns. R. 254, Mr. Justice Platt (the other judges giving no opinion on the point) held the contrary. It is therefore an unsettled question in our own courts. In 5 Cranch, 289, Ch. J. Marshall says; " The bankrupt law of a foreign country is incapable of operating a legal transfer of property in the United States." It has been said of this case, that it was to be regretted that a litigated point of law of great importance should have been settled by a dry decision, unaccompanied by argument or illustration; but we have the authority of Judge Johnson, (12 Wheaton's R. 361,) for saying that the decision in Cranch, was made upon full deliberation. The cases reviewed by Mr. Justice Platt, in 20 Johnson, shew that Chancellor Kent stands upon this question in opposition to all the American judges.

A bankrupt act, it is said, though a municipal law, forms an exception to the general rule that such laws are confined in their operation to the country where they are made, because such act is a rule of international law. If so, the decisions of the supreme court of the U. S. are paramount upon this question, that court being the proper depositary of such law. If an assignment under a commission of bankruptcy in England passes property here, the bankrupt law having a retroactive operation, what would be its effect up-

on a shipment here? would it divest the rights of a purchaser? Chancellor Kent concedes it would not, because the doctrine of relationship is a positive rule of mere municipal policy. If a part, the whole is municipal.

If the assignment passed the property, and the legal interest was vested in the assignee, why came he into a court of equity? why did he not bring his action of trover, detinue or replevin? it was not a case of lien or mortgage requiring the equitable interference of the court. And then, too, this case, where the assignee is the representative of the bankrupt as well as of the creditors, presents the anomaly of an agent suing his principal. If the bankrupt law is in force here, why apply to our courts? why not send a messenger and seize the property? Whether one shall be the representative of another depends upon our laws, and not the laws of a foreign country. Administration granted abroad will not authorize a suit here. The authority to act must be here conferred.

A rule of international law cannot be binding unless it be mutual. Great Britain has a bankrupt law, we have not; there is therefore no mutuality in giving effect here to assignments made there, when a like comity cannot be exercised in England towards us. We are unwilling to have a bankrupt law of our own; and shall we enforce the bankrupt law of a foreign nation?

The following opinions were delivered on the decision of this case:

By Mr. Justice MARCY. There are several objections to the proceedings in this cause in their nature preliminary, which lie in our way to that mainly relied on for the reversal of the chancellor's order. It is said that if the alleged proceedings against the appellant as a bankrupt vested in the provisional assignee the property in question, then the other respondents are improperly joined with him in this suit; and if it is a proceeding on the part of the creditors to obtain a discovery to aid them in their suits at law, then Johnstone, the assignee, should not have been a party. If it should be conceded that there is a misjoinder of complainants in the

bill, a motion to dissolve the injunction issued thereon is not the proper proceeding on the part of the defendant to obtain the benefit of that objection. It should have been presented to the court below by a demurrer to the bill. If it appear that any party to the bill has a right to retain the injunction, this right is not impaired because he is joined with others who have no such right.

But the right of Johnstone, the provisional assignee, to sustain this suit, is called in question. His power, it is said, is only temporary, and lasts only until the creditors make an appointment; and by the course of proceedings in bankruptcy, the creditors must have met and superseded him before this suit was commenced. The provisional assignee has as ample powers as the assignee appointed by the creditors, and he retains his trust until he is " removed at a meeting of the creditors for the choice of assignees, if they shall think fit." (6 Geo. 4th, ch. 16, § 45.) There is not the slightest intimation that Johnstone has been removed ; we must therefore consider him invested with all the rights and authority of a duly constituted assignee. The 88th section of the British bankrupt acts prohibits the bringing of suits in equity by the assignees, without the assent of the major part of the creditors. An objection founded on this section of the statute is made to the proceedings in this case, because the assent of the creditors does not appear. In *Watkins* v. *Fry*, (1 Merivale, 255,) it was admitted by the counsel, who raised a similar objection in that case, that the court always presume an assent where a dissent is not shewn. If this suit was subject to the regulations prescribed by that act of parliament, our courts would infer, as the English courts do, that the assignee acts with the assent of the creditors if the contrary does not appear. Another objection to the bill, or rather to the right of the complainants named in it to have the relief they ask for, is founded on its multifariousness. I think there would be no use in stopping to ascertain whether this objection exists in point of fact, because if the bill was beyond all doubt multifarious, this fact could not properly have any influence upon our decision as to the order from which this appeal is

brought. This is also an objection that should have been presented on demurrer.

The creditors distinctly as such, without judgments, and unconnected with the assignee, have not probably a right to the injunction; but the more serious enquiry is, whether Johnstone, as assignee, either alone or in conjunction with the creditors, has this right. In pursuing this enquiry, we shall be naturally led to consider, 1. What claim or title he derives to the property stayed by the injunction in the custody of the collector of New-York? and 2. If he has any claim to it, has he a right to resort to the proceedings which have been had in this case to enforce that claim?

What is the extent of the operation of an assignment under a bankrupt law of a foreign country, and what right the assignee thereby acquires here, is a grave question, which has called forth much profound learning and able discussion from the late Chancellor Kent in the court of chancery, and Mr. Justice Platt in the supreme court. This question has also been much considered in other tribunals of our country. Some of the controverted points may now be regarded as settled and " laid up among our acknowledged rules of jurisprudence ;" but this case shews that there are some things on this subject that remain to be settled.

Chancellor Kent, influenced by a spirit of liberality which he indulges to a greater degree, perhaps, than almost any other enlightened jurist, and wishing that all the commercial nations of the world might become a confederacy, recognizing and observing in relation to the transactions of the citizens and subjects of each the great principles of justice, adopted in the case of *Holmes* v. *Remsen*, (4 Johns. Ch. R. 460,) not only the doctrine that the succession to and distribution of personal property is regulated by the owner's domicil, and not by the *lex loci rei sitæ*, but he also laid down what, I believe, was then a novelty here, the rule that our courts were called on in the spirit of comity to give, as the English courts profess to do, effect to the title of a foreign assignee, to the prejudice of rights acquired by our own citizens under our own laws, to the property and debts of the bankrupt in this country, provided the foreign assignment, in point of time,

preceded the attachment or lien acquired here. This doc-
trine gives to the proceedings under foreign bankrupt laws
an operation *extra' territorium*, and transfers, by virtue of the
assignment, all the property and all the *choses in action* of the
bankrupt in whatever country they are. By this decision,
mere municipal regulations, (for such undoubtedly is the
character of acts relative to insolvents and bankrupts,) are
undisguisedly turned into international laws. Judge Platt,
in a suit between the same parties in the supreme court, (20
Johns. R. 227,) comparatively confined within very narrow
limits the operation of assignments under a foreign commis-
sion of bankruptcy. He denies the existence of any interna-
tional law on the subject; he admits, however, that there is
a comity, which is always to be exercised with a just regard
to the rights that our citizens have acquired under our laws
to the property of a foreign bankrupt situated in this country,
and to the choses in action due to him here. The associates
of the learned judge forbore to express their concurrence in
this view of that case. If, therefore, we were not to look be-
yond the decisions of our own state tribunals, there would
seem to be a serious conflict of opinion for us to settle.

The highest courts in several of the states distinguished for
their enlightened jurisprudence have entertained views simi-
lar to those of Judge Platt. In Massachusetts, (13 Mass.
R. 146,) in Connecticut, (Kirby's R. 313,) in Pennsylva-
nia, (6 Binney, 353,) in Maryland, (1 Harris & McHenry,
236,) in North and South Carolina, (2 Hayward, 24, Const.
R. 283,) the extra-territorial operation of statutory assign-
ments has been denied. If more was wanting to incline the
balance against the opinion of the late chancellor, enough is
found in two decisions of the supreme court of the U. States,
one before and the other since the cases of *Holmes* v. *Remsen*
were discussed and decided here. In the case of *Harrison*
v. *Sterry*, 5 Cranch, 298,) Ch. J. Marshall says: " The
bankrupt law of a foreign country is incapable of operating
a transfer of property in the United States." That court re-
iterated the same doctrine in the case of *Ogden* v. *Saunders*,
(12 Wheaton, 213.) However satisfied the late chancellor
might have been with his own views on this subject, and how-

ever firmly he believed his positions to be established, he has subsequently acknowledged that they are swept away by this strong current of authority. Speaking with reference to the decision of the case in chancery of *Holmes* v. *Remsen*, he says, that "Whatever consideration might otherwise have been due to the opinion in that case, and to the reasons and decisions on which it rested, the weight of American authority is decidedly the other way ; and it may now be considered a part of the settled jurisprudence of this country, that a prior assignment in bankruptcy under a foreign law will not be permitted to prevail against a subsequent attachment by an American creditor of the bankrupt's effects found here, and our courts will not subject our citizens to the inconvenience of seeking their dividends abroad when they have the means to satisfy them under their own control. (2 Kent's Comm. 330, 1.)

Although the bankrupt law of Great Britain as a law can have no operation here, it is not a legitimate inference from this proposition, that no rights derived from the operation of that law can be regarded in this country or enforced by its tribunals. It is very correctly said, by one of the judges who gave an opinion in the case referred to in Binney's reports, "that an assignment by law has no legal operation out of the country of the law maker ; but by the courtesy of nations, founded on principles of mutual convenience, the laws of one country are sometimes regarded in another." Platt, J. thinks the convenient rule would be, "that statutory assignments *as to creditors*, should operate *infra territorium* only ;" he admits the existence of a comity among nations, and agrees with Chancellor Kent that it ought to be observed *quartenus sine prejudicio indulgentium fieri potest.* I do not discover that this comity has any where been so far withheld as to refuse to foreign assignees a resort to our courts in their character as assignees, or representatives of the bankrupt to secure the rights they have acquired by the assignment ; on the contrary, suits in their own names have, in repeated instances, been sustained and their right to sustain them established by express adjudication. In the case of *Bird and others* v. *Pierpoint*, (1 Johns. R. 118,) Thompson,

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

J., says that, " perhaps we ought not so far to take notice of foreign bankruptcies as to compel prosecutions to be carried on here in the name of the assignees, yet I think we ought to recognize the right of the assignees so as to allow them to prosecute in their own name if they pleased." Livingston, J. in giving his opinion in that case, advocated a doctrine nearly as broad as the English rule, but thought himself restricted in his application of it by the decision of the case of *Van Raugh* v. *Van Arsdaln*, (3 Caines, 154.) Kent, as chief justice, gave the opinion of the court in the case of *Bird and others* v. *Caritat*, (2 Johns. R. 342,) and he there expressly declares, " that there can be no doubt of the right of the assignees under a commission of bankruptcy, (sued out in England,) to collect the debts due to the bankrupt, either by suit directly in their own names or as trustees using the name of the bankrupt." " It is a principle," he further says, " of general practice among nations to admit and give effect to the title of foreign assignees." Ch. J. Parsons, who on other occasions firmly resisted the introduction of the English rule, remarks in the case of *Goodwin* v. *Jones*, (3 Mass. R. 517,) that it is admitted " that the assignee of a bankrupt, duly appointed pursuant to the laws where the bankrupt dwells, may maintain an action in that character in another state, the laws of which are not repugnant to his recovery." In the case of *Milne* v. *Moreton*, (6 Bin. 353,) Yeates, J., who was perhaps more strenuous and bold in denouncing the British doctrine than Ch. J. Parsons, also admits that the American as well as the British decisions assert that the assignees under a foreign commission of bankruptcy are considered the substitutes of the bankrupt, and may support suits in their own names. He adds, that " as between the bankrupt and his debtor this operation is fair, provided the debtor is made safe in his payment; but where it is extended further and thereby affects the rights of strangers, it assumes a different character." In another part of this learned opinion he says, " it is one thing to assert that assignees of bankrupts under foreign institutions should be allowed by the courtesy of nations to support suits as representatives of

such bankrupts for debts due to them, and it is another thing to give efficacy to those institutions to cut out attaching creditors, although posterior in point of time, who have commenced their proceedings under the known laws of the government to which they owe allegiance and from which they are entitled to protection." More cases need not be cited nor better authority adduced to shew that assignees of foreign bankrupts have the right to sue in our courts in their own names. This is not even questioned by many of those who are strenuous in denying all extra territorial operation to foreign bankrupt laws. The right of such assignees to sue does not result from the law directly, but from a long used and well established comity.

But the establishment of this right in the assignee in this case amounts to nothing, if the proceedings against Abraham as a bankrupt have not effected a transfer of the property in question and given the assignee some dominion or right of dominion over it. It is confidently urged by the appellant, that no transfer is effected or rights acquired by the assignee, because the proceedings are the result of a mere municipal law, confined in its influence to the territories of the British government. It must be borne in mind that all the parties to this suit are not only British subjects, but were domiciliated in England when it was commenced. It is admitted on all sides, that personal property is, in some sense, without locality, and is sometimes affected and disposed of by the law of the owner's *domicil.* The proposition is indisputable, that such property follows the owner, and at his decease is to be distributed according to the law of the country in which he was domiciled at the time of his death, after satisfying the claims on it arising under the laws of the country where it is situated. In the case before referred to, (2 Johns. R. 342,) the supreme court of this state decided, that " the general disposition of personal property by the owner in one country will affect it every where, because, in respect to the owner's control over it, personal property has no locality." Ch. J. Tilghman, in giving his opinion in the case before cited from Binney's reports, admits the proposition, (but not to its utmost extent and without some exceptions) " that per-

sonal property has no locality, but is transferred according to the law of the country where the owner is domiciled." The government where it is situated can subject it to regulations and give its citizens claims upon it to satisfy their demands against the owner. When the laws operate on it for any specific objects, it then has, for the purpose of answering those subjects, a locality where it is situated ; but when this is not the case, it is without locality and is subject to the laws of the county where its owner is domiciled. The property in question having no locality for any of the purposes above mentioned, or for others not mentioned, must be considered as following the person of Abraham, the owner ; and if the proceedings under the commission affected him, I can perceive no reason why it did not his property. I again avail myself of a quotation from the very learned and able opinion of Judge Platt, in the case of *Holmes* v. *Remsen*, to confirm the conclusion to which I have arrived or rather which I have adopted " I admit," says he, " that *between the bankrupt and his assignee and English creditors they are all bound by the law of their own country ;* and although I deny the effect of a statutory assignment to create a *lien* here so as to deprive American creditors of their remedy by attachment under our laws, yet it seems to me that the bankrupt, by the law of his domicil, was incapacitated to make any assignment after the act of bankruptcy for which the commission issued ; *as to him, all his property and* choses in action *throughout the world, and his power over it was taken away and the assignee under the commission substituted in his stead.*" If there is any soundness in these views, the commission against Abraham and the assignment by the commissioners divested him of the property in question and transferred it to Johnstone, the assignee.

Another view of this case arising out of the peculiar situation of the property in question, when the commission issued may be taken, which may be satisfactory to those who cannot acquiesce in the forgoing conclusion. Hitherto I have considered the property as in this country when the commission issued. Such, however, was not the fact.

It is a self evident proposition that the municipal laws of a country, unless restricted by their terms or nature, operate to the utmost extent of the jurisdiction of that country. Each nation has a concurrent jurisdiction upon the ocean ; the municipal laws of England in relation to the subjects of that country, and the property of those subjects afloat upon the ocean, must be adjudged, I think, to have the same effect as if both were within its territorial limits. This position is warranted by the decision of the supreme court of the United States in the case of *Hudson* v. *Guestier*, (6 Cranch, 281,) where a seizure on the ocean beyond the territorial jurisdiction of France, for the breach of a municipal regulation was declared to be legal.

The commission of bankruptcy against Abraham was issued on the 8th of August, and the property did not arrive here until the first of September. About the time he left England with the property in question, probably a few days after, in a ship, the national character of which is not disclosed, while a subject of and domiciled in that country, and many days before he arrived here, he was declared, in due form of law, a bankrupt, and all his effects assigned to one of the respondents. When the commission issued the property was within the jurisdiction of the British government, but not where that jurisdiction is absolute and exclusive : the bankrupt fleeing, as it is alleged, from his own country, had not then found a refuge in any other, nor had his property found a protection from the pursuit of his fellow subjects by being placed where the laws of their own country were counteracted or overruled by those of another government. This view of the subject would seem to clear the case from all doubt, if any remained, as to the actual transfer of the property upon which the injunction rests.

But it is said that if we recognize the right of the assignee to sue in our courts, we must entertain all questions which may arise under the British bankrupt law ; and in that case our courts will become subsidiary to the lord chancellor of England, sitting in bankruptcy ; that we must look to the incipient steps of the proceedings, and pass on their correctness, and must annul or reverse them as we shall find them

irregular or erroneous. Such, I apprehend will not be the necessary consequence of permitting the assignees to resort to our courts for the assertion of their rights.

Our courts are at all times open to the subjects of every other government, and I never yet heard it urged that we ought to close them to such suitors because our judges may be called on to consider the laws of other countries. If the rights of a foreign assignee, by voluntary assignment, may be enforced in our tribunals, and every day's practice shows not only that they can be, but that they are, I do not see why claims may not be prosecuted in them arising from a statutory assignment. Indeed, our own supreme court, (2 Johns. Rep. 342, as well as that of Massachusetts, (3 Mass. Rep. 517,) have regarded these statutory assignments as the voluntary acts of the bankrupts, and given to them the same effect in transferring property as assignments voluntary in fact. The correctness of this position to its fullest extent has been questioned, and I have no doubt properly : but there can be no objection to it in principle, where all the parties are subjects of the power which authorized the assignment, and their rights arise on contracts made within the jurisdiction of their own government. What was said by lord Ellenborough in the case of *Potter* v. *Brown*, (5 East, 129,) is equally true when applied to the judicial proceedings of this country, and illustrates several of the views which have been taken in this case, but more particularly that now under consideration. " We always import," he says, " together with their persons, the existing relations of foreigners as between themselves, according to the laws of their respective countries, except where those laws clash with the rights of our own subjects, and one or the other of the laws must necessarily give way ; in which case our own are entitled to preference." The application of the *lex loci contractus* brings under the consideration of our courts every day the proceedings of the bankrupt laws of other countries and the insolvent laws of our sister states. This is so common and familiar that I need not stop to refer to authorities to establish it. Faith will be given to the duly authenticated proceedings of their own government in relation to these foreigners.

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

If the commission, as is alleged, was improvidently issued against the appellant, or the proceedings have been in any respect irregularly conducted, the course for him to take, as was very properly suggested by the chancellor, is to apply to the proper tribunal of his own country for correction or redress.

It is further urged that there is no equity in the bill, or if there is any, it has been fully answered. It is well settled, that creditors at large or before judgment are not entitled to an injunction to restrain the debtor in the free use or disposition of his property. (2 Johns. Ch. R. 144.) The creditors in this case, merely as such, not having judgments against Abraham, cannot set up a right to retain this injunction, but the assignee may; for though the absconding as charged in the bill, is denied, as well as the fact of insolvency, yet the proceedings under the bankrupt act, and the actual assignment to Johnstone, one of the respondents, are not denied. It is said the assignee has no more than an unestablised claim to the property, and, as our courts are open to him, he must resort to them, as our own citizens would be required to do, to establish it; and until he has done so, he cannot have an injunction. I have endeavored to shew that the assignee in this case has not merely a claim to the property, but by the assignment it is transferred to him, and the possession of Abraham as against him is illegal. His rights in relation to it are even more perfect than those of a judgment creditor; he has a clear vested right, and in such a case there can be no doubt that the chancellor may enjoin the wrongful possessor, and prevent a sale by him. I am therefore of opinion that the chancellor properly refused to grant the motion for dissolving the injunction.

The decison of the second point raised by the appellant that costs ought not to have been granted by the chancellor, seems to be involved in the first. The costs of motions of this kind are at the discretion of the chancellor, and if he properly refused the motion to dissolve the injunction, we cannot say that he improperly charged the party making it with the costs.

I am in favor of affirming the order of the chancellor.

Mr. Justice Sutherland concurred in the opinion pronounced by Mr. Justice Marcy.

Abraham
v.
Plestoro.

By Mr. Senator S. Allen. It is admitted by the chancellor, in the opinion pronounced by him in this case, that it is doubtful whether the decision of Chancellor Kent in the case of *Holmes* v. *Remsen* can be sustained, as it was strongly questioned and ably opposed by Judge Platt, and is in opposition to the decisions of the state courts in Connecticut, Massachusetts, Pennsylvania, Maryland and both the Carolinas ; but, in his opinion, this case steers clear of all the cases alluded to, as the contest in those cases was between foreign assignees and domestic creditors, while in the present instance the controversy is between the bankrupt and his assignee, both foreigners and subjects of the same government.

It appears to me, however, that the difference in the cases cannot alter the main and leading principle which must control on this subject, and which, I apprehend, applies as well to the cases alluded to by the chancellor as to the present case, which is, whether a foreign creditor shall possess and may exercise a power over his debtor in this country not allowed to our own citizens ? or, in other words, shall a foreign creditor be permitted to seize upon the property of his debtor without a judgment obtained in the due course of law, while such privilege is withheld from our own citizens ?

In the case of *Wiggins* v. *Armstrong*, (2 Johns. Ch. R. 144,) it was held that a creditor before judgment is not entitled to the interference of the court by injunction; and there appear to be numerous cases reported to the same effect. If, then, we award to foreigners the same latitude of proceeding under our laws that we allow to our own citizens, it is all that can be required at our hands, and all that the most liberal rule of comity between nations can demand.

It was urged by the counsel for the respondents, that inasmuch as Great Britain permits assignees under a foreign commission of bankruptcy to take the property of the bankrupt in England, the same rule ought to operate here. If a general bankrupt law existed in this country, there would be some force in the remark, as in that case there would be a

reciprocity of benefit; but, under present circumstances, the advantage is all on the side of the British subject, and therefore unequal.

The creditors of the bankrupt having elected, under the commission of bankruptcy, not to proceed against their debtor by action or suit, in accordance with the 59th section of the British bankrupt law, can have no effect, in my view, to debar them from proceeding by suits at law in this state, as this provision of the act can only operate as a bar to such proceedings in the dominions of Great Britain; and so the respondents have viewed it; for it appears they have commenced proceedings in the superior court of the city of New-York for the recovery of their claims. Having done so, I am for leaving them to pursue their remedy by a due course of law, and am of opinion that the order of the chancellor refusing to dissolve the injunction issued in this case ought to be reversed.

By Mr. Senator MAYNARD. There is no allegation or proof of the national character of the ship *Great Britain*, on board of which the property of the appellant involved in this controversy was at the time of the provisional assignment under the commission of bankruptcy. As that is a material circumstance, it may be fairly inferred that if it was a British ship it would have been so averred. In the absence of such averment, it cannot be asked by the respondent that the court should make a presumption in his favor. He is bound to establish his case by the necessary averments. The question is then distinctly presented, whether a provisional assignment, under the bankrupt act of Great Britain, transfers the property of the imputed bankrupt *in this country;* for here the property is found at the issuing of the injunction, and there is no allegation that it was within the jurisdiction of England at the time of the assignment. The presumption is as fair that it was on board an American ship, as that it was on board of a British ship; and if so, it was, at the date of the assignment, within the jurisdiction of this country.

The principle on which the decisions seem to have been made, which give to a final assignment under a bankrupt act

the effect to transfer the property of a bankrupt in foreign countries, is, that it is a *voluntary assignment*, made *upon good consideration.* The consideration to the bankrupt is, that upon giving up all his property, he is entitled to a discharge from a greater amount of debt. It is a *voluntary assignment*, because submission to the laws is implied from every individual, when the tribunals of his country have pronounced a *final decision* in a matter in which he is interested. When the proceedings in a case of bankruptcy are completed, submission may be inferred, and the final assignment is voluntary as well as made upon good consideration. But no decision asserts the principle that the assignment transfers the property of the bankrupt by *the force of the law.* The principle of voluntary submission and good consideration cannot be implied in the case of a *provisional assignment*, after which the bankrupt is allowed time to resist the proceedings and supersede the commission; and more especially where the alleged bankrupt does in fact resist and denies the legality and correctness of those proceedings. The cases therefore in which it has been held that an assignment did transfer the property of a bankrupt in a foreign country, appear to me not applicable to the case now under consideration.

But is it the law, that an assignment does transfer the property of a foreign bankrupt in this country? Without a particular consideration of the decisions in the state courts, it may be safely asserted that they have not been harmonious on this subject, either in their reasoning or results. The law therefore has not been uniformly or definitively settled. The supreme court of the United States have decided, (5 Cranch, 202, 12 Wheaton, 361,) that an assignment under a foreign bankrupt act, is incapable of effecting a transfer of the property of the bankrupt in this country. That court is the peculiar depositary of international law. Its decisions upon questions affecting the comity of nations are entitled to the force of authority. It may be presumed, that that court have taken the most enlarged and comprehensive views of the subject, and that the principles it has adopted are the safest for the interests of this country. If we decide in con-

formity with the decisions of that high tribunal, uniformity will be produced, a result certainly desirable upon a great subject of international law. But if we decide differently, the strange and inconvenient anomaly will be produced, that the law of this state, without any peculiar reason, will be different from the law of the whole Union.

But if the assignment in this case did operate a transfer of the property in question, what need is there of the aid of a court of chancery to enable the assignee to obtain possession of it? If by virtue of the assignment, the assignee acquired a *legal title* to the property, the courts of law are abundantly competent to afford the required relief.

These views, without examination of the minor points, lead me to the conclusion that the order of his honor the chancellor ought to be reversed.

By Mr. Senator OLIVER. Johnstone, one of the complainants below, is an assignee under a foreign commission of bankruptcy, asking the aid of the court of chancery of this state to enforce his claims to property *in this country* in the constructive possession of the bankrupt, the title to which is alleged to have passed to him by the deed of assignment.

As against the *creditors* of the bankrupt in this country, I am inclined to think that it may be considered as settled law that the assignment would not operate to transfer the property, so as to defeat such creditors in any proceedings they might commence under our laws against the property itself for the recovery of debts due to them. This is admitted by the chancellor, in the opinion delivered by him, which we are now reviewing; but he supposes that a principle ought to prevail in the determination of the rights of the parties, where the contest is between *the assignee and the bankrupt,* different from what would govern where the question arises between *a foreign assignee and domestic creditors.* To this doctrine I cannot subscribe, though I admit the question is not free from difficulty and embarrassment; for while on the one hand, I feel the full force of the obligation which every well regulated government is under to compel justice

to be done between man and man, without regard to country or clime, and to give every facility to foreigners which is afforded to its own citizens, by throwing open the doors of the temple of justice for the prosecution of claims, and for compelling dishonest and fraudulent debtors to satisfy the just and honest claims of their creditors; on the other, I cannot consent to become auxiliary to enforcing a bankrupt law of a foreign nation against one of its citizens or subjects.

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

The question is not whether a foreign assignee shall be permitted to sue in our courts; in relation to that there can be but one opinion. Had the proceedings in bankruptcy in this case been perfected, the bankrupt acquiescing in their justice and propriety, and the assignee substituted in his place, and a question had arisen between him and a debtor of the estate, no one would have doubted or questioned the right of the assignee to sue in our courts; but that is not the case we are considering. The question here is, whether the comity of nations, or, in other words, the enlightened and liberal principles of jurisprudence, require that we shall enforce the bankrupt law of a foreign nation, by giving effect to a statutory assignment, not merely by allowing the assignee to sue in our courts when the validity and legality of the assignment is not disputed, but by enforcing the harsh, rigorous and penal provisions of a bankrupt law *against the bankrupt himself*, who denies that he is insolvent, and insists that if a commission of bankruptcy has issued against him, (of which he professes his total ignorance,) it has issued improvidently and illegally. I question whether a similar case can be found in the books, and I much doubt whether the English courts, notwithstanding all the liberality exhibited by them in giving effect to foreign statutory assignments, ever have or ever will consent to execute a foreign bankrupt act against the bankrupt himself. To my mind, there seems a manifest impropriety in so doing, and that the grossest injustice might flow from it, especially in a case like the present, where the proceedings are only incipient, and may be set aside by the bankrupt coming in and disputing them, he being allowed to do so, at any time within

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

twelve months after the issuing of the commission.   (§ 92 *of
the Bankrupt Law of England.*)   Our courts cannot pro-
tect the bankrupt against injustice, nor, after having stripped
him of his property, can they give him the benefits provided
by the act under which the proceedings are had against him.
They cannot even shield him from oppression, nor prevent
his creditors from incarcerating him in a prison at the very
time they are attempting to enforce the bankrupt act against
him.   The appellant is now in close custody at the suit of
the very creditors who sued out the commission, and though
it is suggested by the chancellor that he might perhaps be
discharged on common bail, I question the power of a court
here to grant such discharge ; for to authorize them to do so,
they would have to look into the provisions of a bankrupt act
of a foreign state, and could determine the rights of the par-
ties only by issuing to construe its provisions and enforcing
them according to the intent of the makers of the act, which
I presume they would not, and acting advisedly could not
do.

On the whole, I subscribe to the opinion of Ch. J. Mar-
shall, in 5 Cranch, 289, that " the bankrupt law of a foreign
country is incapable of operating a legal transfer of property
in the United States," and I fully concur in the reasoning of
Mr. Justice Platt, in the case of *Holmes* v. *Remsen.* (20
Johns. R. 260, 261,) where commenting upon the opinion of
Chancellor Kent, in which he advanced the proposition " that
our courts are bound to give effect to a foreign assignment,
because it is equivalent to a voluntary act of the party over
his own property, every man's assent being presumed to a
statute," observes that it might with equal justice be said, that
if an *Englishman* commits an act of *treason,* the consequent
forfeiture of his estate shall be deemed equivalent *here* to
his own voluntary transfer, as that an assignment under the
bankrupt law shall be considered as the party's own act.
In the one case the assignment is in execution of laws by
which he was bound, and he has voluntarily committed the
act authorizing the making of it ; in the other he spontane ·
ously does the act which, according to the laws of his coun-

try, worked the forfeiture. Surely our courts would not en- ALBANY, force such forfeiture, although the right of the government in Dec. 1829. the one case would be as perfect as the right of the assignee Abraham in the other. In either case if the party escapes beyond the v. reach of the penal laws of his own country, he is freed from Plestoro. their operation; and though in the case of the *bankrupt*, let him go where he will in the civilized world, he cannot escape his creditors, and will be required to answer to them, he cannot be subjected to a *forfeiture* of his goods in consequence of the enactment of laws which have no effect beyond the territories subject to such laws. The obligation of a *contract* is universal, and may be enforced wherever the contracting party may be found. Not so a municipal law, which no country other than that which enacted it is bound to enforce. Had the parties and the property remained within the jurisdiction of the country where the laws were in operation under which the assignment was made, the remedies given by that law might have been enforced, and the act carried into perfect and complete execution. Had the assignee succeeded in reducing the property to his own possession and control whilst within the jurisdiction of England, his title having been thus consummated, might have been enforced here; but the party to be affected by the law having passed into the territories of another state, where that law cannot be known and acknowledged as of binding efficacy, it is as a dead letter for every purpose which it has failed to accomplish. What it has laid its hands upon it will hold, but it can make no further acquisitions. The result is, in my opinion, that the parties are *remitted* to their original characters of debtor and creditor, in which they will be recognized by our laws, and every facility given to the latter to enforce his claims against the former, which is given to our own citizens to enforce their claims against their debtors; but no remedy can be awarded to the foreign assignee which would be denied to our own citizens. An injunction would not be allowed to a citizen here, claiming to be the owner of personal property in the hands of a third person before judgment, nor ought it to be allowed to a foreign assignee.

There is one other view of this question which to my mind produces the same conclusion as it respects the present appeal. The utmost latitude that has been claimed as to the force and effect of a *stutulory assignment* is, that it shall be considered equivalent to a *voluntary act* of the party over his own property. If so, what would be the effect of a voluntary conveyance, where the vendor refuses to deliver the property to the vendee? Could the vendee claim the property and take it out of the possession of the vendor by any process of law, if he refused to deliver it? or would he be driven to his action, either of *assumpsit* for the recovery of damages for the non-performance of the contract, or of *trover* for the non-delivery, or of *detinue* for the detention? Undeniably one or the other of these remedies only could be resorted to; and should he apply to chancery to prevent the vendor from using or disposing of the property, he would be told that his remedy at law was perfect, and that the court could not aid him. So in this case, if the assignment under the commission of bankruptcy be considered equivalent to the act of the party, all that the assignee can do is to demand the property, and on refusal, bring his action of trover. Surely no greater effect will be given by our courts to this assignment than if it was the voluntary act of the party; in which case, if after making a contract the vendor prefers to retain the property, there is no principle of law which can compel him to yield it up, or to restrain him in the use or disposition of it. All that can be asked, are damages for the non-performance. Admitting therefore what cannot even be pretended in this case, that the proceedings had been perfected, that the time for the bankrupt to apply to set them aside had expired, that the adjudication of bankruptcy had become final and conclusive beyond appeal or reversal, and that in adjudicating upon the question, the same force and effect should be given to the statutory assignment as to a voluntary conveyance, the remedy of the assignee was at law, and not in equity. I am therefore of opinion that the injunction improperly issued, and that the order of the chancellor refusing to dissolve ought to be reversed.

By Mr. Senator STEBBINS. The questions presented upon this appeal are, 1. Whether the proceedings under the bankrupt act in England operated to transfer the property in question ; 2. If so, whether the assignee was entitled to the injunction ; and 3. If not, whether it ought to be retained in favor of the creditors at large.

It has been determined by the supreme court of the United States and by the state courts of Connecticut, Massachussetts, Pennsylvania, Maryland, and both the Carolinas, that an assignment under the bankrupt law of England does not operate as a legal transfer of the personal property and choses in action of the bankrupt in this country. The cases are referred to in the opinion pronounced in the court of chancery. It seems to be conceded also that such is the law in this state, notwithstanding the decision of Chancellor Kent, in *Holmes* v. *Remsen*, (4 Johns. Ch. R. 460,) which case appears to me to exhibit the efforts of a great mind and persevering industry to rear a beautiful structure of international law without much regard to its usefulness or the solidity of its materials. The doctrine of that case is, that by the operation of the laws of a foreign kingdom, the property and debts of a foreigner in this country are transferred beyond the reach of his American creditors, and that by the comity of nations, our own citizens are bound to look quietly on, while the English creditors withdraw and divide the effects, upon the credit of which alone perhaps their debts were contracted. Without, however, entering into an investigation of this principle, which it appears to me is fraught with consequences the most mischievous and impolitic, I deem it sufficient to refer to the able opinion of Mr. Justice Platt, in a subsequent case between the same parties, (20 Johns, R. 229,) as containing, in my judgment, a triumphant refutation of the doctrine of Chancellor Kent.

This case, however, is said not to be affected by the principle of the cases above mentioned, because *there* the contest was between foreign assignees and domestic creditors claiming under the laws of this country, and *here* it is between the assignee and the bankrupt himself, all resident in England ; and secondly, because the property itself at the time of the assign-

ment was constructively within the jurisdiction of Great Britain.

The question is, whether the assignment wrought a change of property ? and being an assignment by operation of law, can it affect property beyond the reach of that law ? This I take to be the reason why property here is held not to pass under a foreign commission of bankruptcy : the bankrupt laws do not reach it. If this property, therefore, was without the jurisdiction of Great Britain at the time of the assignment, I perceive no materiality in the enquiry as to the residence of the parties or between whom the controversy may happen to be. Would this court enforce the lien of an English judgment upon property here, and not within the realm of England at the time of the judgment, even against the debtor, himself a British subject? Would it enjoin the delivery of it to the agent of the sheriff there, for the purpose of enabling him to levy ? Would it against such a party enforce the forfeiture of goods for treason ? But in the case of a *voluntary* assignment or sale of property it passes, although without the jurisdiction of the government where the parties are domiciled, because the obligation of contracts is acknowledged every where, and in respect to the control of the *owner* over personal property it has no locality ; but in respect to the control which the *law* can exercise over it, locality is every thing. Much of the difficulty upon this point arises I apprehend from the loose remark in several of the cases, that an assignment under the bankrupt law is equivalent to a *voluntary* assignment ; a remark which, without some exceptions, appears to me unwarrantable.

Is it true then that this property was constructively within the jurisdiction of Great Britain at the time of the assignment ? It was on the high seas on its way to this country, consigned to the appellant, a British subject, who was on board the same ship ; but whether the vessel was British or American does not appear. If it is conceded, and I think it cannot be denied, that the assignment under the commission would pass the property within the jurisdiction of England, but not that within the jurisdiction of this country, it appears to me the complainant, the assignee, should have shewn that

the property was within the jurisdiction of that country in order to establish his title to it under the assignment.

Upon this branch of the case the enquiry is very material whether it was laden on board a British or American vessel; for I cannot admit that *British* merchandise, although in the actual possession of a *British* subject, on board of an *American* vessel on the high seas is still within the jurisdiction of that country. Whatever may be the British doctrine upon that subject, ours seems to me to be too deeply rooted in the policy of the government to be shaken at this day. From the organization of our government the American doctrine has been, that the flag covers the merchandise and that American ships make American goods. We claim exclusive jurisdiction over American ships floating under the protection of the American flag, whatever may be the national character of the property it covers; and most of the collisions which we have experienced with other nations have been in defence of this right against claims by belligerents to the right of search and seizure of enemy's property. The steady effort of the government has been to engraft this principle into the law of nations, and it will be found recognized in our treaty with Colombia, and if I mistake not, in treaties with other powers. I hold, therefore, that if this property was laden on board an American vessel and on the high seas at the time of the assignment, it was within the jurisdiction of the United States, and could no more pass by that assignment than if lodged where it now is, in the custom-house at New-York; and that if laden on board of a British vessel, that fact should have been averred by the assignee as essential to his title. The conclusion that follows is, that the assignee has not shewn a title to the property to enable him to retain the injunction.

But if the assignee had title to the property, was he entitled to the injunction issued in this cause? The injunction issued to restrain the collector from delivering the property to Abraham, and to restrain Abraham from receiving or prosecuting for it on the ground alleged in the bill, that it belonged to the assignee in virtue of the assignment. Why not resort to the remedy at law by an action of trover or detinue?

ALBANY,
Dec. 1829.

Abraham
v.
Plestoro.

The next question is, whether the creditors who are joined with the assignee as complainants are entitled to retain this injunction? They are all creditors at large, having no lien by judgment, and I apprehend, therefore, are not entitled to the extraordinary interposition of the court by injunction. The cases of *Wiggins and others* v. *Armstrong*, (2 Johns. Ch. R. 144,) and *Moran* v. *Dawes*, (1 Hopk. Ch. R. 365,) are both strong cases upon this point. In the latter, it was determined that a plaintiff, even after a verdict in his favor, was not entitled to an injunction to restrain the defendant from alienating his property, where the declared object of advertising it for sale was to defeat the collection of the judgment. The former case sustains the same principle.

In my opinion, neither the assignee nor the creditors of the appellant were entitled to the injunction issued in this cause, and the order of the court of chancery denying the motion to dissolve it ought therefore to be reversed.

By Mr. Senator Throop. Various exceptions have been taken to the form of the bill in this case, which, it appears to me, it is not material to discuss or decide, as they do not *involve the main* question which arises upon this appeal. Besides, they can be obviated by amendments in the court below.

It may well be doubted if the divers interests of creditors at large can be united in one bill praying for common relief, there being no community of interest in their several claims. They also set up the rights of the assignee, which are inconsistent with the claims of the creditors themselves, and the creditors will not be allowed, if Johnstone is entitled to the possession of this property under his title derived through the proceedings in bankruptcy set up in this bill, to take from Abraham, by the same proceeding, all means of payment, and at the same time compel him to pay or be adjudged to pay their debts. But they ask no such thing; they unite with the assignee, in the prayer of the bill, that the property in controversy may be delivered to Johnstone under his rights and in his character of assignee, and in the mean time that Jonathan Thompson, the custom house officer, be prohibited from delivering it up to Abraham.

The bill is sufficient to raise the questions, did Johnstone, the assignee, acquire the right of property in these goods? and can he proceed in chancery in his own name to recover the possession of them?

Upon the argument the counsel for the appellant went into an examination of the bankrupt laws of England; but in the view which I take of this case, I cannot perceive how this court or the court of chancery is called upon, in the remedy here sought to be obtained, to execute the bankrupt laws of England, or are sought to be made ancillary to their commissioners in bankruptcy. The bill alleges that upon the absconding of Abraham, proceedings in bankruptcy were commenced against him, and he was in due form declared and adjudged a bankrupt; that according to the laws of England, the deed of assignment divested the bankrupt of his property in the goods in question, and the title was transferred to Johnstone, the assignee, who is one of the complainants. Such is the effect of those proceedings; it is a transfer of title by operation of law. Are those allegations denied? If not, the title of Johnstone against the bankrupt is perfect, and it can make no difference, in respect to the right of property, whether this transfer of title was by force of the bankrupt laws of England, or under their laws in relation to judgments and executions, or to voluntary transfers by the party himself.

As to these material allegations, upon which the question of title in this case depends, the answer is, in effect, silent. The appellant denies that he absconded with a view to elude his creditors, but he neither admits or denies the issuing of the commission of bankruptcy against him, nor the adjudication of the commissioners that he was a bankrupt, nor the deed of assignment; in effect, for all the purposes of the motion to dissolve the injunction, he says nothing in answer to these allegations of the bill. His denial of absconding might be material if the proceedings were in a forum acting under the English laws of bankruptcy; but upon this motion in our own courts, where the question is the right of property, the adjudication of the English tribunal is to be considered conclusive against him as to the fact of bankruptcy. If, upon this question of continuing the injunction, the chancellor had un-

ALBANY
Dec. 1829.

Abraham
v.
Plestoro.

dertaken to reverse the adjudication of the English tribunal upon the strength of the denial of the appellant that he had committed the act of bankruptcy adjudged against him in that country, he would have been acting as a court of appeal, and it would then have been more readily perceived that the high judicial tribunal of a sovereign and independent government had become ancillary to the commissioners of bankruptcy in England, and had undertaken to execute the bankrupt laws of that country, while our own legislature had refused to provide such a system for their own citizens. On the contrary, he has gone no further than to consider the adjudication, uncontradicted as it is, as the judgment of a competent tribunal, and has given to the deed of assignment its legal effect upon the title to the property in question.

It is to be observed that all the parties to this controversy belong to the country under whose laws this assignment was made. The bill charges the defendant with being domiciled in England, whence he absconded. He denies the absconding, and says that he left his address for the city of New-York, announcing his intention, in which he was sincere, of returning to England in November next ensuing, having left persons in the meantime to carry on his business with a large capital. Such a temporary absence, upon a specific adventure, could not work a charge of domicil. Not only is the defendant to be considered domiciled in England, but, in my view of the case, the property was within the jurisdiction of that country at the time of the adjudication and assignment on the 8th of August. He left England in July, with a sincere and avowed intention of a speedy return, having the goods in the same ship consigned to himself on board, and he arrived in New-York in September following. The national character of the ship no where appears, a fact which, if the defendant deemed it of any importance or influence in his case, he should have shewn. It would be a forced presumption to say that this was an American vessel, so as to withdraw this property from the jurisdiction of the country of the claimants, and give it a locality in this country. If this presumption cannot legally be drawn from this case, then this property was actually within the jurisdiction of England at

the time of the assignment and under their laws Johnstone, the assignee, became the owner. But if it were not, the claimants were subjects of that country and domiciled there, and the right of personal property is to be decided by the laws of the country where the owner is domiciled. (1 East, 11. 8 Vesey, 82. 2 Rose's Bank. Cases, 99, 313.)

Independent, however, of this inquiry, the deed of assignment under these proceedings was evidence of the paramount title of Johnstone in the property. In *Bird et al.* v. *Caritat,* (2 Johns. R. 344,) Ch. J. Kent says, "it is a principle of general practice among nations to admit and give effect to the title of foreign assignees. This is done on the ground that the conveyance under the bankrupt laws of the country where the owner is domiciled is equivalent to a voluntary conveyance; and the general disposition of personal property by the owner in one country will affect it every where, because in respect to the owner's control over it, personal property has no locality." "There can be no doubt of the right of the assignees to collect the debts due to the bankrupt, either by a suit directly in their own names or as trustees using the name of the bankrupt." He lays down the same general proposition, as chancellor, in *Holmes* v. *Remsen,* (4 Johns. Ch. R. 460,) in these words: "It is a principle of national law to take notice of and give effect to the title of foreign assignees; and the assignees of a foreign bankrupt may sue here for debts due to the bankrupt estate, either as such assignees or in the name of the bankrupt." These principles apply to a cause like the present, (where the subject matter is not a chose in action, but a bale of goods,) brought by the assignee against his bankrupt, both being subjects of England at the time of the assignment. And the opinion delivered by Platt, J. in *Holmes* v. *Remsen,* (20 Johns. R. 267,) does not affect their authority. They are recognized as law by the English courts, and the rights of foreign assignees are enforced in that country. (1 H. Black. R. 691, 131, 132. 1 Doug. 169. 4 T. R. 182.)

When this principle of international law is applied to this case, can there be any doubt of the right of the assignee to sue in the courts of this state? The assignment under the

bankrupt law is equivalent to a voluntary assignment by the bankrupt, inasmuch as it deprives the bankrupt of all his former title to or control over the property; which effect the courts of foreign countries admit and recognize. The bankrupt then, in effect, as to property in his possession, holds it subject to the paramount title of the assignee. By operation of law he becomes the agent of the assignee, (Cowp. 570, 7 T. R. 296,) and being found in this country with the property of his assignee in his possession or subject to his control, it would be nugatory to acknowledge Johnstone's right of property and deny him a remedy for wrongs to such property in our courts.

But it is objected that the assignee cannot sue in his own name; and it is manifest that he has no mode of compelling the bankrupt to sue himself; and hence it is said there is no remedy in the case. If, however, there be any doubt of the courts of law affording an adequate remedy in the name of the assignee, such objection does not apply to a proceeding in chancery where the rights of assignees, as in case of mortgages, &c. are recognized and prosecuted in their own names. That there is no adequate remedy at law for acknowledged rights, is one ground of the jurisdiction of that court. But in this case, the rights sought to be enforced and the wrongs sought to be remedied, are peculiarly the subjects of equity jurisdiction. The complainant, as trustee for all the creditors, is seeking to arrest the defendant in the commission of a flagrant fraud in respect to the trust property. He finds it pledged in the hands of a third person, out of the actual possession of the defendant. He seeks to continue it where it is found until the conflicting claims between him and his bankrupt or agent are judicially determined. His bill shews such a case as leaves no doubt, that if the property is restored to the possession of the defendant, he will consummate the fraud against this trustee and the creditors, which he was in the act of accomplishing when he was arrested by the injunction in this case. These circumstances might separately in some cases, afford sufficient reason for exercising the power of that court by injunction; and when united they leave no doubt in my mind of the correct exercise of that power in this case. The defendant not hav-

ing answered or denied the proceedings under which the assignee derives his title, the continuance of the injunction was of course proper, and the motion to dissolve it ought to have been denied. I am therefore for affirming the order of the chancellor.

ALBANY,
Dec. 1829.

Beach
v.
Fulton Bank.

On the final decision of the question, Shall the order of the chancellor refusing to dissolve the injunction be affirmed or reversed? the members ranged themselves as follows:

*For affirmance*—Mr. Justice SUTHERLAND, Mr. Justice MARCY, and Senators THROOP and WOODWARD, 4.

*For reversal*—Senators S. ALLEN, BOUGHTON, HAGER, HAYDEN, HUBBARD, MATHER, MAYNARD, M'CARTY, McLEAN, McMARTIN, OLIVER, REXFORD, SMITH, STEBBINS, TODD, WARREN and WHEELER, 17.

Whereupon the decretal order of the chancellor was ordered, adjudged and decreed to be reversed.

*Decretal order reversed.*