## Johnson & Miller *vs.* Hunt and others.

A statute of one of the states of the Union, authorizing proceedings against *absconding debtors*, and an assignment of their property for the benefit of their creditors, being in the nature of a *bankrupt law*, the assignment does not work a legal transfer of the property of the debtor, so as to render invalid a conveyance of property made by him, *in another state* to a citizen of such state, for a *bona fide* consideration ; and such assignment, in one state, not being obligatory upon the citizens of another state, is not binding upon the citizens of the state in which the proceedings are had, in respect to property conveyed to them by the debtor, in another state. *It was accordingly held,* that the property of an *absconding debtor,* taken by him from this state, and transferred by him in another state, in satisfaction of a judgment there render-

ed against him, was not subject to the control of the *trustees* of his estate, after the property was brought back to this state, although *he* and the *creditor* to whom the transfer was made were at the time *residents of this state*, and the transfer was made *after* the publication of the notice that an attachment had issued.

ERROR from the Chenango common pleas. The defendants in error as *trustees of an absconding debtor*, one H. T. Hollis, brought an action of *trover* against Johnson & Miller, the plaintiffs in error, for a horse and waggon and other property obtained by them, *in the state of Pennsylvania*, from Hollis, the absconding debtor. Hollis and the defendants below were residents in the county of Chenango, in this state. On 19th February, 1815, Hollis absconded. On 5th day of March, a warrant was issued by a circuit judge, in pursuance of the provisions of the revised statutes, specified in the article, " Of attachments against absconding, concealed and [ *88 ] non-resident debtors," 2 *R. S.* 2, commanding *the sheriff to attach and safely keep, all the estate, real and personal, of Hollis, and a notice of the issuing of such warrant was duly published on the 13th day of March, that being its first publication. Subsequent to that day, the defendants below being creditors of Hollis, having separate demands against him, went in pursuit of and overtook him on the 31st March, at Wilkesbarre, in Pennsylvania, where they respectively obtained process from a justice's court, recovered judgments against him, which executions were issued, by virtue of which he was arrested and taken into custody. To obtain his liberty he paid *Johnson*, one of the defendants below, the amount of his judgment, and turned out the property in question to *Miller*, the other defendant, in satisfaction of his judgment. The property thus delivered to Miller, belonged to Hollis when he absconded, except the wagon, and that he obtained in exchange for a cutter, with which he left his home. The property was brought back to Chenango, where it was demanded of the defendants by the plaintiffs below, who, on the 9th *July* were duly appointed *trustees* of the estate of Hollis. The demand was not complied with. A question was raised on the trial whether, if the action were maintainable against *Miller*, it would lie against *Johnson;* but there being some evidence of a joint conversion, the court submitted the question to the jury. The court also charged the jury that if the property in question was removed from this state, and the defendants knew that Hollis was an absconding debtor at the time when they received it from him in Pennsylvania, he and they being citizens of this state, and the property being received after the publication of the notice of the issuing of the attachment, they were liable for it whether it was removed from this state before or after the publication of the notice ; and that the legal proceedings had in Pennsylvania, were no protection to the defendants. To which charge the defendants excepted. The jury found for the plaintiffs, and the defendants, on a bill of exceptions, sued out a writ of error. The cause was submitted to the court on written arguments by

*J. A. Collier*, for the plaintiffs in error.

*J. Clapp*, for defendants in error.

*By the Court*, COWEN, J.    The statute concerning attachments    [ *89 ]
against absconding debtors, who are residents of this state, (1 *R.
S.* 764, 2d ed.) authorizes a summary *ex parte* proceeding, without person-
al notice, even to the debtor, by which the title to his entire estate, real and
personal, may be divested, and assigned to his trustees ; by whom it is to be
converted into cash, and the proceeds distributed in payment of his debts.
To guard, as far as possible, against fraud upon the fund, and preferences of
one creditor over another, the 32d § declares, that all sales, assignments,
transfers, mortgages and conveyances, of any part of the estate real or per-
sonal, &c. of such absconding debtor, made after the first publication of the
notice mentioned in § 28, in payment of, or as security for any existing prior
debt, or for any other consideration, and all judgments confessed by him af-
ter that time, shall be absolutely void, as against his creditors.

It is not denied by the counsel for the plaintiffs in error, that the transfer
was within the general terms of the act ; but he insists that the statute had
no operation in the state of Pennsylvania, where the transfer was effected.

The act in question is in nature of a bankrupt law.    The whole proceed-
ings are conducted and the assignment effected *in invitum*, without the par-
ticipation of the bankrupt, farther than the assent of every man may be im-
plied to the statutes of his own country ; and it is too late since the decision
of the court for the correction of errors, in *Abraham* v. *Plestoro*, 3 *Wen-
dell*, 538, to question the general doctrine contended for by the counsel for
the plaintiffs in error.    That case related to a proceeding precisely similar
in principle under the bankrupt law of England.    The absconding debtor
had fled to this country, bringing property with him in a ship, which he de-
posited at the custom house in the city of New-York.    In the meantime,
proceedings in bankruptcy had been instituted against him in England, a pro-
visional assignee had been appointed, and this followed by a general cession
of the bankrupt's property.    The assignee and others, being creditors, and
they, with the bankrupt, being all British subjects, filed their bill
*and obtained an injunction restraining the property in the hands    [ *90 ]
of the custom house officer, to await the decision of suits at law,
which they had here commenced against the same bankrupt, and be held
and forthcoming on any executions which might be eventually obtained.
The learned chancellor admitted, that had the contest arisen between the
creditors abroad claiming under the proceedings in bankruptcy, and creditors
here claiming adversely under our laws, the preference would be due to the
latter.    But he made an exception in that case, inasmuch as the question

arose entirely between the bankrupt and his assignee and creditors, all residing in the country under whose laws the assignment was made. On appeal, Justices Marcy and Sutherland, with two senators, agreed that the distinction was rightly taken by the chancellor, and were for affirming his decree. But a very large majority of the court were in favor of a reversal; and I understand the senators who argued in favor of a reversal, as all concurring in the rule laid down by the supreme court of the United States in *Harrison* v. *Sterry*, 5 *Cranch*, 289, without any express qualification, even as between resident subjects of the country in which the law was enacted, viz. that the bankrupt law of a foreign country is incapable of operating a legal transfer of property in the United States. The doctrine rests on the same footing as between one state and another. That was held in *Ogden* v. *Saunders*, 12 *Wheat.* 358, and in *Raymond* v. *Johnson*. 11 *Johns. R.* 488. In the latter case, the plaintiff had assigned all his debts, among which was the claim on the note now sued for, and been discharged under the insolvent law of New-Jersey. This court denied that the foreign assignee could sue here in his own name, citing *Bird* v. *Caritat*, 2 *Johns. R.* 342. The assignment in the latter case was by English bankrupts; and its legal operation here denied, on the ground, among others, as stated by Kent, Ch. J., that "the *mode of recovering* the debts of the bankrupt, will depend upon the *forms of proceeding* in the country and in the *forum*, in which the assignee institutes his suit." I cite this remark to show, what I shall by and [ *91 ] by have occasion to notice again, that the question *before us must be dealt with as depending on the effect of the *lex fori*, and not the *lex loci contractus*.

But for the present, let us return to *Abraham* v. *Plestoro*. It seems to me that, if I have not mistaken the point decided by that case, it is unnecessary to go farther. The amount of the decision, as I understand it, is, that an assignment *in invitum*, under the law of one state or nation, has no operation in another, even with respect to its own citizens; that the bankrupt, a subject of the very country under whose laws he was proceeded against, may, on crossing the territorial line, dispose of the property which he has brought with him; may withhold it entirely from the creditors who are proceeding against him in the foreign jurisdiction; and it follows, that other creditors coming from the same jurisdiction may either pursue him by attachment, by judgment and execution, or take a voluntary transfer of the property so brought by the debtor in satisfaction of claims. If so, it would be absurd to say, that, on the creditor's return, he should account in the courts of his country, for what he had thus obtained under the express sanction of the foreign law.

It cannot, I think, be denied with success, that, if the decision in *Abraham* v. *Plestoro* be referrable to the principal point stated in that case as the

ground of reversal, then all the consequences I have mentioned must follow. But the application of the opinions expressed upon that point is sought to be diverted, by saying that other points were also stated as the ground of reversal; and perhaps the chancellor's decree might have been reversed upon them. That is true; but the effect of the foreign proceeding upon the right of the bankrupt was the main question, the only question on the merits debated in either court. The others were, whether the creditors and assignee could join in the suit; whether there was not a complete remedy at law; whether the chancellor had acted discreetly in granting the extraordinary remedy by injunction; whether a mere provisional assignee was entitled to a remedy; and whether there was any remedy till the claims of the creditors were carried to judgment. On some of these grounds, it is said *the court of appeals merely refused to continue the injunction;  [ *92 ] but on which, it is impossible to pronounce. It may be out of our power to answer this criticism with absolute assurance. But I cannot bring myself to believe that the vote of reversal proceeded upon the minor grounds. The opinions actually expressed on the principal point against the decree, were equal to all the votes for affirmance; four to four. The whole vote for reversal was seventeen. The bill was brought in aid of British proceedings in bankruptcy, and in favour of a trustee, either of which facts was a sufficient answer to all jurisdictional objection; for both are the peculiar subjects of equity cognizance; and the injunction was a necessary consequence, if the proceedings could be regarded here. If the injunction were a thing of discretion, it was not for the court of appeal to dissolve it on the ground that the discretion might have been improperly exercised; and the question of misjoinder, as both the chancellor and Marcy, J. remarked, could not be raised on a motion to dissolve. I do not believe, notwithstanding what fell from some of the learned senators, that the decree would have been reversed, had the majority thought our courts ought to interfere and uphold the rights of the foreign assignee, either on the ground of strict right or international comity.

But it is said that *Abraham* v. *Plestoro*, at most, decides on the effect which will be given by the state of New-York to the bankrupt law of England. Whereas here the question is as to the effect of our own laws on our own citizens, on property taken from, but brought back to our own jurisdiction. I answer, the effect of our own laws is precisely the same as would have been the effect in Pennsylvania had this question arisen there. The debtor had fled to that state, the defendants below followed, obtained judgment there for an honest debt, arrested the absconding debtor in virtue of executions, but discharged him, thus releasing the debt, on his paying the judgments. The property in question was received in satisfaction of Miller's debt. I do not entertain the least doubt that had the pendency of the

proceedings here been pleaded in abatement there, the plea
[ *93 ]   *would have been disregarded.   That it would, as against a citizen
of Pennsylvania, there can be no doubt.   *Milne* v. *Moreton*, 6
*Binn.* 353.   *Mulliken* v. *Aughinbaugh*, 1 *Pennsylvania R.* 117.   The
case is the same in principle as if Hollis, the debtor, had been sued by for-
eign attachment, as against which the supreme court of Pennsylvania held
that assignments under foreign bankrupt laws are inoperative.   *Id.*   *Byrne*
v. *Walker*, 7 *Serg. & Rawle*, 483.   In *Mulliken* v. *Aughinbaugh*, the
court made an exception, because the plaintiff and insolvent were both citi-
zens of Maryland, where the insolvent had himself applied for a discharge,
and had himself made an assignment.   The proceeding was not, therefore,
*in invitum.*   Had it been, we are bound to suppose that court would have
acted on the principle established in *Abraham* v. *Plestoro*.   That they will
so act in respect to us, is apparent, from what Yeates, J. said in *Milne* v.
*Moreton*, 6 *Binn.* 367, if for no other reason, yet because a like proceed-
ing in that state would not be recognized here.

But independently of reciprocal courtesy, upon what reason can states
be called on to surrender their own ordinary and regular remedies, merely
because creditors in a foreign state have been driven to institute such a pro-
ceeding as the one now in question?   Ought it to have the least operation
beyond our own territories?   Above all, is it right for us to say, that, had
the proceeding taken place in Pennsylvania, we would utterly disregard it,
allowing her citizens to proceed in our courts against the fugitive, or obtain
satisfaction by a voluntary assignment of the goods he brought with him ;
but, on the other hand, punish our citizens for acting on the same principle
in Pennsylvania?   The English courts do certainly compel their citizens to
account for property of her bankrupts, thus obtained abroad.   Her cases
are summed up by Nott, J. in *Topham's assignees* v. *Chapman*, 1 *Rep.
Const. Court of S. Car.* 283, 288.   But it is there insisted that she would
not go farther, and Sir William Grant so held in *Brickwood* v. *Miller*, 3
*Meriv.* 279, though it is notorious that her cases hold a bankrupt
[ *94 ]   assignment to be operative on the personal effects *of the bankrupt
wherever they may be situate.   Her courts, however, are, at
least, consistent ; for they accord to foreign bankrupt assignments the same
extensive operation which they claim for their own ; the same effect as if
the assignment had been voluntary.   *Abraham* v. *Plestoro* expressly denies
this effect ; and so far the court were unanimous.   The utmost that the
judges of this court who sat there, (Marcy and Sutherland, Js.) claimed,
was, that we should give effect to the foreign assignment where its aid was
not invoked in hostility to our own tribunals or some intervening right of
third persons acquired under our own laws.   That, I admit, is the general
course of the Pennsylvania courts.   *Byrne* v. *Walker*, 7 *Serg. & Rawle*,

483. Marcy and Sutherland, Js. professed to follow the doctrine of the supreme court of the United States, as summed up by Mr. Justice Johnson, in *Ogden* v. *Saunders*, 12 *Wheat.* 358, *et seq.* I have examined that opinion; and, as I understand it, all these assignments coerced by foreign laws, are placed on the same footing, including even those which result in a discharge of the bankrupt's contracts. See also per Parker, Ch. J. in *Blake* v. *Williams*, 6 *Pick.* 306. They are allowed to have an infra territorial operation, and nothing beyond. The courts will not suffer them to stand on the footing of the *lex loci contractus;* but only on that of the *lex fori*, from the operation of which, it is well known, all persons are exempt, whether citizens or strangers, the moment they cross the boundany line of the state which enacted the law. In short, the absconding debtor act could no more be brought to bear upon one of our own citizens in Pennsylvania, than could our statute of limitations. *Story's Confl. of Laws*, 481, 482, § 575, 576. The reasons on which the American cases proceed are well summed up by Mr. Justice Story, in the treatise cited, *p.* 246. *et seq.* He agrees, that the doctrine here is diametrically opposite to the English. See also 2 *Kent's Comm.* 407., *3d ed.* Chancellor Kent, *id.* 406, retracts his former opinion, (for he had followed the British doctrine in *Holmes* v. *Remsen*, 4 *Johns. Ch. R.* 460,) in these words: " It may now be considered as a part of the settled jurisprudence of this *country, that per- [ *95 ] sonal property, as against creditors, has locality, and the *lex loci rei sitæ* prevails over the law of the domicil with regard to the rule of preferences in the case of insolvent's estates." The rule thus qualified by Chancellor Kent, would operate as a complete protection to the defendants below; for every step they took was with a view to secure their debts, under process in Pennsylvania. He cites several cases which maintain this rule in favour of domestic creditors, even as against a voluntary assignment made abroad for the general benefit of creditors. Such was *Ingraham* v. *Geyer*, 13 *Mass. R.* 146, *Fox* v. *Adams*, 5. *Greenl. R.* 245, *Olivier* v. *Townes*, 2 *Mart. Lou. R. N. S.* 93, *Norris* v. *Mumford*, 3 *id.* 1st series, 20, *Mitchel* v. *M'Millan*, 3 *id.* 676, *Lord* v. *Brig Watchman*, 8 *Am. Jurist*, 284, (*Maine Distr. Court U. S. Cor. Ware, J.*)

I admit this rule has been commonly put, both with regard to voluntary assignments, and those which are *in invitum*, with an exception against the creditor of the country whose law has ordered the assignment. *Id. Saunders* v. *Williams*, 5 *N. H. Rep.* 213. *Milne* v. *Moreton*, 6 *Binn.* 353. *Bohlen* v. *Cleaveland*, 5 *Mason*, 174. *Holmes* v. *Remsen*, 20 *Johns. R.* 229. And the exception was expressly recognized by the provincial court of Maryland in 1766, which superseded a foreign attachment there, at the suit of British creditors, who came in conflict with a bankrupt assignment in England. *Burk* v. *M'Clain*, 1 *Har. & M'Hen.* 236. In *Topham's*

*assignees* v. *Chapman*, however, before cited, Nott, J. said he was not aware that the domicil of the attaching creditor would make any difference, in the ultimate decision of the question. In that case, the attaching creditors were allowed a preference over the British assignees, without being put to show that they were American citizens. Nothing appearing one way or the other, on the question of their citizenship, he said the court were bound to consider them as American citizens. Keeping our eye steadily upon the true principle, I apprehend we shall find that, in whatever way the party honestly acquires title to the bankrupt's property, situate in a foreign state, his citizenship has nothing to do with the question. "The laws of [ *96 ] other *governments," says chancellor Kent, " have no force beyond their territorial limits ; and if permitted to operate in other states, it is upon a principle of comity ; and only when neither the state nor its citizens would suffer any inconvenience from the application of the foreign law." 2 *Kent's Comm.* 406, 3*d* ed.

The case of *Abraham* v. *Plestoro*, as I have endeavoured to explain it, is no more than a jealous application of the distinction laid down by *Huberus*, as he is understood by the American commentators on conflicting laws. "When there is no positive law," says Mr. Justice Story, "the general rule is to govern, with the exception of such cases as fall within the known principle of *Huberus*, that it is not prejudicial to the state, or to the just rights of its citizens. And this is the very ground upon which the objection to the ubiquity of operation of the bankrupt laws of a country, as respects personal estate is to be rested." He adds, "There is a marked distinction between a voluntary conveyance of property by the owner, and a conveyance by operation of law in cases of bankruptcy *in invitum*. Laws cannot force the will, nor compel any man to make a conveyance. In place of a voluntary conveyance, all that the legislature of a country can do, when justice requires it, is to assume the disposition of it *in invitum*. But their statutable conveyance *cannot* operate upon *any subject but what is within their territory*. This makes a solid distinction between a voluntary conveyance and an involuntary legal conveyance. The former has no relation to place ; the latter, on the contrary, has the *strictest* relation to place." He afterwards adds, "Nor can it be said that an assignment by the bankrupt laws is with the consent of the bankrupt, because he assents by implication to such laws. For, in the same way it may be said that a man committing a crime for which his estate is forfeited, voluntarily consents to its transfer. But the principle, whether correct or not, can only apply to cases, where the debtor and creditor belong to the same conntry." *Story's Confl. of Laws*, 346, 348. The learned commentator is giving the general ground of the American cases ; and how completely *Abraham* v. [ *97 ] *Plestoro* subdues the doubt with *which he concludes, I have alrea-

dy shown. The law which compels the assignment has no extra territorial force. Its voice cannot be heard, and there is no atmosphere which it can breathe in the foreign soil. It there becomes a dead letter. What is the effect of a proceeding by general attachment under our absconding debtor act ? It professes to seize all the debtor's property in his absence, without personal notice, and compels all the creditors to come in and take a rateable dividend. It operates as a discharge of the bankrupt's debts for so much only as shall be actually paid. The defendants below, instead of electing to come in and take their dividend, follow the debtor to a distant region, where the law is unknown, and there enforce a collection of their whole claims. I am aware of the cases, both in this state and in the supreme court of the United States, which would give efficacy to an insolvent discharge against them, and the plausibility with which it may be thence inferred, that they shall be bound by what may be called an analogous proceeding. I answer that insolvent discharges, with what propriety it is not necessary to decide, when the law under which they are granted precedes the contract, are considered as tactitly allowed by it, and are therefore permitted to operate, upon the principle of the *lex loci contractus.* *Ogden* v. *Saunders,* 12 *Wheat.* 213. *Mather* v. *Bush,* 16 *Johns. R.* 233. There are several distinctions, however which withdraw the present proceeding from the operation of that principle. · Our cases which refuse to bind a party by the judgment of a foreign state obtained without actual service of process, *Kilburn* v. *Woodworth,* 5 *Johns. R.* 37, 41, *Robinson* v. *Ward's* *ex'rs,* 8 *id.* 86, 91, if carried to the extent which they appear to warrant, would interpose one objection. Again : In the case at bar, there was nothing which could operate upon the contract. All that the proceedings sought for, was a change of the remedy against the property of the insolvent, by drawing the entire administration of his effects, to the trustees thereafter to be appoininted ; and calling in the defendants below as parties to the distribution. They preferred to proceed in Pennsylvania; and I have yet to learn that the courts there had any power, at *least   [ *98 ] that they were in duty bound to give up the law of their own forum, in deference to the remedy which we had prescribed. Were the defendants below bound when they reached Pennsylvania, to respect this foreign statute ? I have already noticed they would not be bound by our statute of limitation. That they would not have been bound, even by an insolvent discharge of Hollis' person merely, we have often held ; and such is the almost unbroken current of decision. 4 *Cowen,* 530, *note, and the cases there cited.* The reason is, that the courts of each state, proceed according to its own laws, and will not be turned aside, till they see that the contract itself has been constitutionally acted upon by the foreign legislature.

This the Pennsylvania court could not see ; or, which is the same thing,

would not attend to; and the defendants went on. In *Brickwood* v. *Miller*, 3 *Meriv.* 281, even Sir Wm. Grant, a British M. R., seemed very justly startled with the doctrine on which these assignees seek to recover. He met with great difficulty, in seeing how the English doctrine could be maintained, in the extent to which it had gone. He said, " it does seem an anomalous proceeding, for the courts of one country, to take from a man what has been adjudged to him by the courts of another." As I understand that case, an English creditor had gone to the West Indies, and seized and recovered by foreign attachment, the effects of an English bankrupt, which were abroad in the hands of a West India firm to which he belonged. It is true, the claim was against that firm jointly. But I do not see that such a circumstance can take much, if any, from the force of the case. The M. R. proceeds : " How are the West India partners to be controlled in the management of their trades, or restrained by any proceeding here, from paying and applying the partnership effects as they think fit ? Equality of distribution cannot possibly be obtained [in England.] Are we then, to tell a creditor, that, because he happens to reside in England, and his debt has been contracted there, he shall not be allowed to take such remedies against his foreign debtor, as the laws of their country may permit ? In the cases before [ *99 ] the lord chancellor, the court, *taking from the creditor his separate remedy, professed to give him his distributive share of the whole partnership property. But it cannot, in this case, reach the West Indian property, or bind the West Indian partners. Then you would take from the partnership creditor one remedy, without substituting any other in the place of it. This would be to say, that the West India property must be left for any creditors, but *English* creditors." Every word of the master of the rolls, is applicable to the present case, as put by the assignees. They say to the defendants, " though the property was out of this state and on the wing, though neither we nor our courts could stop it, or appropriate it in a course of distribution, though a foreign creditor might attach, or a foreign citizen purchase it, yet you being from the state of New York, were alone absolutely disqualified." It is sought to distinguish the case, because the defendants did not proceed *in rem*, by foreign attachment. It is agreed that if they had, the cases may apply; but the master of the rolls puts it broadly, even against the engrossing power of the English bankrupt acts, that, the persons and property being out of his jurisdiction, it might be dealt with generally and unqualifiedly, as if there had been no bankruptcy in the case. The meaning is, that it may be taken in execution, or sold, or transferred voluntarily in payment of debts. It is true, the cases have nearly all arisen between the assignees and attaching creditors; but the general principle is pointed no more to them, than any other person, claiming under the law of the foreign state. Accordingly, in *Milne* v. *Moreton*, one of these attachment cases,

arising in this very state of Pennsylvania, adversely to the British bankrupt act, Tilghman, C. J., said he did not consider the principle of the *lex loci* as applicable ; that there was no question about the contract ; but only on a collateral matter, viz. property of the debtor totally unconnected with it ; and in many respects, the law of the country where the action is brought, must prevail. He likened the defence, to one founded on the foreign statute of limitations. 6 *Binn.* 360. On the other-hand, we must not forget that we are administering to the laws of Pennsylvania, though the right
of the *defendants below be that of mere purchasers. If their con- [ *100 ] tract was valid by the law of that state, it is so here. In that view, the defendants may properly urge in their protection, the *lex loci contractus.*

Let us look at the claim of the plaintiffs below in one other point of view. Suppose Hollis had died after reaching Pennsylvania, and the plaintiffs below had taken letters of administration on his property here. Clearly they could not, as administrators, have sued or had any remedy there, to recover the property now in dispute, or its avails. Suppose administration to have been taken in Pennsylvania, the personal representative in that state alone would be entitled ; and that would be so even if Hollis had died in this state. The case is quite analogous to the one before us, and has sometimes been put on the ground of the *lex fori.* *See Cowen & Hill's Notes to* 1 *Phil. Ev.* 870, 1, *et seq.* A *fortiori,* should the foreign administrator be sued and compelled to pay even by a New-York creditor, or should he sell the property of his intestate situate in Pennsylvania.

It is of the nature of the *lex fori,* that it should be strictly confined to its own territory. It respects the remedy merely ; and being thus withdrawn from the foreign country, though it profess to operate on personal property which has found its way there, such property is in effect left, like land, absolutely to the *lex loci rei sitæ.* It may be sold or seized by execution, the same as if it were land ; and it would be extraordinary at least, not to say tantalizing, that our own citizens who may happen legally to purchase it in the foreign country, where we admit our own law to be unknown, should upon their return be divested of their right, and that transferred to another. Standing before the courts of Pennsylvania, or contracting in that state, we admit they acted with perfect regularity ; returning to New-York, we must punish them as wrongdoers. If the *lex loci contractus* have no application, and if, as Mr. Justice Story says, the assent of the bankrupt himself ought not to be implied, on what principle shall we be more severe with the innocent creditor ? But this very point was adjudged in *Taylor* v. *Geary,* *Kirby,* 313. There the supreme court *of Connecticut declared as [ *101 ] follows : " A commission of bankruptcy against the defendants in England does not secure their effects here. But they remain, as before, transferrable, and open to the attachment of their creditors as well *Brit-*

*ish* as American. The plaintiffs indeed can have but one satisfaction; but till they obtain that, they have a right to pursue their remedy against the effects of their bankrupt debtors in either country, or both at the same time." The court evidently regarded the question as one depending entirely on the *lex fori*. In *Wallace* v. *Patterson*, 2 *Har. & McHen.* 463, one of the firm who sued out the foreign attachment resided in England, where the bankrupt also resided, and yet the attachment was sustained. Martin, attorney general, for the defendant, admitted without qualification, that the English bankrupt laws did not extend their iufluence to Maryland. *Id.* 469.

I have thus looked into some general principles and cases other than *Abraham* v. *Plestoro*, lest I may have mistaken the force of the latter; and I am entirely satisfied that whether we proceed upon such well settled rules of local law as are of obvious application, or upon direct authority derived from our own court of dernier resort, or upon authority in other American courts, we must hold that the defendants below, or rather Miller, acquired a complete title to the property in question by his purchase in Pennsylvania, which was not affected by his return into this state, and placing himself within reach of our process. We do not deny that had he proceeded in fraud of the statute he would have been liable. The mere fact of his having notice that proceedings were commenced, however, was not enough to fasten the charge of fraud upon him. There is no pretence that his claim was not legal and honest, nor that he did not proceed entirely with a view to his own security, doing as little injury to the other creditors as might be, without imparing his own claim. In truth, there is no doubt that both he and Johnson conferred a benefit upon the other creditors by a pursuit which must have been hopeless to them personally, thus satisfying liens which would otherwise have come against the general fuud.

[ *102 ]     *Without examining the minor exceptions taken in the court below, we are of opinion that the judgment must be reversed, and a *venire de novo* go from that court, the costs to abide the event.

---

## ANON.

Where a sheriff or other officer is in default for not returning an *attachment*, the court in *term time* will allow an attachment against such officer and appoint an *elizor* to serve the same; and under peculiar circumstances will appoint such elizor residing in a county other than that in which the defendant in the process resides.

Where a new sheriff has come into office, the process will be directed to him, and an elizor will not be appointed.

A MOTION was made for a non-bailable attachment against a coroner of